**O. W. MATHEWS, Appellant,**

v.

**O'Dell RYAN et al., Appellees.**

No. 6823.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 22, 1958.

Rehearing Denied Jan. 26, 1959.

O. W. Mathews, appellant, filed suit in Hansford County, Texas, against O'Dell Ryan and Gale S. Rogers, both of Ochiltree County, Texas, and Perryton National Bank, a Corporation domiciled in Ochiltree County, Texas. He alleged Ryan owed him for pasturage of two groups of cattle in the total original number of 600 head, divided equally into two groups From the time the cattle were placed on pasturage in the fall until they were weighed at delivery in the spring, 181 of the 600 head had perished, 174 of them in the great March snow storm of 1957 when thousands of cattle were lost in the Texas Panhandle.

Suit was filed on the theory of conversion, appellant alleging an agistors' lien for pasturage and that defendants took the cattle against his will and without his consent after they were weighed to determine their gain. The record shows the appellee bank had a mortgage on the entire 600 head of cattle dated about three weeks prior to the time of weighing on April 15, 1957, about five months after they were placed on pasture and subsequent to the storm in which 174 head had perished. The testimony shows in effect that on Sunday night, April 14, Ryan, the owner of the cattle, went to see Rogers, an executive officer of the appellee bank and told him he was in trouble and wanted him to go weigh the cattle the next day because he was expecting trouble with Mathews on his settlement of the amount of the pasturage. The two went to see Mr. Garland, a higher executive officer of the bank and Mr. Garland told Gale Rogers to take their mortgage on the cattle with him to Spearman the next day when he went to weigh the cattle. Mathews testified in effect that Rogers showed him the mortgage and told him he was there to protect the bank's interest and the bank was foreclosing on Ryan. Rogers himself testified:

"Q. Why do you say that you showed him the mortgage? A. He asked to see it.

Sanders, Scott, Saunders & Smith, Amarillo; O. P. Fields, Jr., Amarillo, of counsel, for appellant.

Lemon & Close, Perryton, for appellees.

CHAPMAN, Justice.

This is a venue case.

"Q.. Why did he ask to see it? A. Well, when we were in the car, and we disagreed on the way to settle the contract, he said, 'Well, I will go get a Court Order to hold these cattle,' and I told him, to protect our interest, I would go get one to try to get them released; that we had a big interest in them.

"Q. Uh-huh. A. And he wanted to see the mortgage and I showed it to him!

"Q. I see. So you were just saying to him that, all right, you go get your court order if you want to, but I got a mortgage here, and if you get one, I am going to go get one and take the cattle. That is what you said to him, wasn't it? A. Well, I would have to wait and see what he did.

"Q. What did you say you said to him, Mr. Rogers? A. That—he said he ought to go get a court order to hold these cattle, and I said if he did, why, I would try to get one to get them released.

"Q. Which was just tantamount to saying to him, you get your court order, and I will go get one on my mortgage, is that right? A. You might read it in there. I don't know—it didn't come about.

"Q. Yes, sir. That was what you intended for him to understand by what you said, wasn't it? A. Well, he could read it like he wanted to.

"Q. No. I didn't ask you about him. I am asking you about your mind, Mr. Rogers. You intended for Orville Mathews to understand you to say to him, 'You do whatever you want to, court order, or not, if you do, I am going to take them over under this mortgage with a court order.' That is what you wanted him to understand,

isn't it? A. Well, in effect, that is probably the way it worked out."

The written contracts were identical, except as to dates, and provided:

"This Agreement, made and entered into this the *13th* day of *September*, 1956 by and between *O'Dell Ryan*, hereinafter referred to as First Party, and *O. W. Mathews* hereinafter referred to as Second Party, to-wit:

"Witnesseth

"Whereas, First Party is desirous of pasturing cattle on irrigated crops owned by Second Party and Second Party is desirous of taking the livestock in to pasture them under the following terms and conditions, to-wit:

"1. First Party agrees to deliver *300* head of cattle to Second Party's place for pasture between the 1st of November, 1956 and the 1st of December, 1956. The cattle are to be weighed prior to such delivery.

"2. Second Party agrees to furnish all feed, salt and water as may be required and to be responsible for generally taking care of the cattle and in particular, to see that all strays are located and returned.

"3. First Party agrees to take the above described cattle off the pasture between the 1st of April, 1957 and the 15th of April, 1957. Immediately after being taken off pasture, cattle then on hand are to be weighed. After the cattle are weighed and a 2% per cent shrinkage is taken from their weight at the time they are taken off pasture, the beginning weight is to be deducted from their weight at the time they are taken off pasture (less shrinkage) and First Party then agrees to pay Second Party the sum of fifteen cents per pound on the gain, if

any, as the consideration for pasturing such cattle.

"Witness our hands in duplicate the day and year first above written.

"/s/ Odell Ryan
"First Party
"/s/ O. W. Mathews
"Second Party"

Appellant contended he was entitled to pasturage of 15 cents per pound based on the average gain per head while Ryan claimed he was to pay only on the bulk pounds difference in what all the cattle weighed when placed on pasture with what they weighed in bulk when removed. Since the loss of 181 head caused the 419 head of cattle in bulk to weigh less when removed than the 600 head originally placed on pasturage, Ryan contends he owes Mathews nothing. In other words, the contention between the parties is on the question of who was to stand the death loss, the owner or the one furnishing pasture. Based on an average gain per head less the 2 per cent shrinkage provided in the contract the amount owed for pasturage of the original 600 head would have been something over $7,000. It is inconceivable to this writer that a farmer in the Texas Panhandle, who would naturally be conscious of the hazards of pasturing cattle on wheat through the winter months in the area here involved would agree to act as insurer of the lives of the cattle during the time.

Appellees claim the contracts were completely unambiguous and provided payment on the difference in bulk weight. Appellant contends the contracts were ambiguous, made no provision as to who would stand the death loss and that parol evidence was admissible to show their true meaning. He alleged and offered proof to the effect that he, in the presence of Hall Jones raised the point with Ryan when he brought the contracts that they were not plain as to who would stand the death loss and that Ryan said, "The contract was new

and he didn't know how much of it, and he just had it drawn up there for—hadn't been very long. And so he said then that he would go ahead and stand the death loss. We talked about it and he said that was customary all over the country, and he said he would go ahead and stand all the death loss, and I said 'Well, if you will do that, well, I will accept this.' And so that is the way our trade was made. Hall Jones was there and he heard the conversation and he talked about it, and he said that we should have that in there, and I thought we should, too, but Mr. Ryan thought it would be all right, so that is the way we went."

The trial court held the contracts unambiguous, refused to admit, except for bills of exceptions, any oral testimony of custom in the county as to who would stand death loss on the cattle, and refused any testimony as to the oral agreement the parties had concerning who would stand the death loss. Then at the close of the testimony he granted the pleas of privilege and transferred the case to Ochiltree County.

A very careful study of the contracts involved convinces us there is not any wording in the instruments that make provision as to who would stand the death loss of the cattle. To say the least, they are not so plain as to reflect no shadow of doubt as to their meaning. This being true the use of the parol evidence rule should not be invoked to defeat an intention and understanding between the parties as to who would stand such loss, which this record shows could be clearly proven, and without which appellant, from the record in this case, has no cause of action for almost a half year of pasturage on 600 head of cattle. In Ellisor v. Kennedy, 128 S.W.2d 842, 844 (writ refused) the Court of Civil Appeals at Galveston said:

" 'The ultimate purpose of the courts should be to arrive at the real intention of the parties to a contract, and to give the contract force accordingly.

It is an important rule of construction that a written contract, plain and reflecting no shadow of doubt as to its meaning, shall be the sole evidence of the intention of the contracting parties. But, if the contract is not clearly unambiguous, the rule should not be permitted to defeat an intention and understanding which can be clearly proven by parol, and to lead to a conclusion which is absurd.' "

Even if the written contracts herein are not ambiguous the evidence of Hall Jones and appellant was admissible under the record made in this case for the purpose of ascertaining the real intention of the parties. In Scott v. Walden, Tex.Com.App., 140 Tex. 31, 165 S.W.2d 449, 452, 154 A. L.R. 1 it is said:

"Whether or not, strickly speaking, the language of the grant is ambiguous need not be discussed, for even though it is not ambiguous on its face parol evidence was nevertheless properly admitted to apply the language to the subject with which it dealt for the purpose of ascertaining the real intention of the parties. First National Bank of Amarillo v. Rush, Tex. Com.App., 210 S.W. 521; Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007; Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579; Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004."

Our Supreme Court has announced practically the same rule when it said:

"It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties." Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579, 583.

This Court in Archer v. Skelly Oil Co., 314 S.W.2d 655 has recently followed the same rules as those just quoted.

We are not unmindful of the fact that a separate agreement could not be proven by parol if it is in conflict with the plain words of the written contract, absent an allegation of fraud, accident or mistake, Bryant Co. v. Hamlin Independent School District, 118 Tex. 255, 14 S.W.2d 53, but as we view the written contracts with which we are here concerned they are practically void of any language that would even tend to show such agreement. To say the least they are not unambiguous on the subject. This is particularly true when we consider that the well settled law of this State requires that a contract should be construed most strictly against the party who prepared it and tendered it to the other for acceptance, Brandtjen & Kluge, Inc. v. Tarter, Tex.Civ.App., 236 S.W.2d 550; Masterson v. Allen, Tex.Civ.App., 69 S.W. 2d 539 (writ refused), which was Ryan in our case. Thus, "It may be shown that a parol contract was made independently, wholly collateral to, and distinct from, a written one made at the same time. In such cases, the parol evidence is used, not to vary the terms of the written instrument, but to show either that it is inoperative as an entire and independent agreement, or that it is collateral and irrelevant; and, in many instances, the terms reduced to writing may constitute but a small part of the real contract." Roberts v. Bonaparte, 1890, 73 Md. 191, 20 A. 918, 919, 10 L.R.A. 689. A similar rule has been recognized by the Supreme Court of Tennessee in Turner v. Abbott, 116 Tenn. 718, 94 S.W. 64, 6 L.R.A., N.S., 892.

Appellant also offered proof of custom in the county as to who would stand the death loss in pasturage of cattle, the owner of the cattle or the person furnishing the pasture. The trial court, consistent with its holding that the contract was unambiguous, refused to consider the testi-

mony. We have already held the contract on this question is ambiguous, which would permit the introduction of evidence of custom. "Evidence of custom is admissible only to explain an ambiguous contract or to add to it an element not in contravention of its terms * * *." Miller v. Gray, 136 Tex. 196, 149 S.W.2d 582, 583, 141 A. L.R. 1237. We consider the rule just stated particularly applicable to the instant case. Had the trial court permitted the parol testimony such evidence would have established an amount due appellant for the pasturage. It then becomes necessary for us to determine if there was a conversion established in Hansford County.

■ Article 5502, R.C.S. gives to all owners of pastures a lien on all animals placed with them for pasturage, sometimes called an agistors' lien. The cattle in question having been placed on appellant's pasture long before appellee bank acquired its lien, it requires no citation of authority to say appellant's lien was superior. Since Ryan was having the cattle hauled out of the State the only practical method appellant had, under the record in this case, to preserve any lien he had was to retain possession of them. We believe it is without contradiction from the record in this case that Rogers was acting both as agent of the bank and of Ryan on the day of the weighing. Certainly, it could not be seriously argued that he was not acting for the bank because he testified himself that on Sunday night in the conference between Ryan and the two bankers, Mr. Garland, his superior, told him to take the mortgage the next morning to show that the bank had a definite interest in the cattle. Mr. Rogers also admitted in effect that he let appellant understand that regardless of what he (appellant) did about keeping the cattle until he was paid, he (Rogers) was going to take them over under the bank's mortgage. Mr. Rogers also testified:

"Q. At any rate, before you got those cattle moved away from that stockpen, Orville Mathews asked you to leave them there, didn't he? A. Yes, sir.

"Q. Did you tell him why you were there? A. Yes.

"Q. And what did you tell him? A. I told him I was Gale Rogers from Perryton National Bank at Perryton and I was there to weigh Doc Ryan's cattle for him.

"Q. And what did he say? A. Well, he said, 'Is the money in the bank for the pasture,' and I said, 'Yes, it is.' And he noticed the trucks driving up about then, and asked where the cattle were going, and I told him Kansas somewhere.

"Q. I see. All right. Now, at any time that morning did Mr. Mathews ever tell you to hold the cattle here in Spearman at the pens there, at any time that morning? A. When we were loading—let's see, after we came back from Mr. Sansing's office, I went back out there, and they were loading the last truck.

"Q. Is that the first time he gave you a direct order that he wanted the cattle to stay? A. Yes, sir.

"Q. And that was when they were loading the last truck, I take it? A. Yes; that was while they were loading the last truck."

Though appellee Ryan did not even testify in the case excerpts from his deposition were offered in evidence by appellant in which he admitted he told Mr. Garland he was in trouble and he would like for them to take the cattle over and Mr. Garland said, "We will help you, Doc." He also admitted:

"Q. Then who was it worked out the plan of Mr. Gale Rogers going over there and getting the cattle? A. Well, I guess it was me.

"Q. Well, did you tell Mr. Garland here to send Rogers to go over there

and get them? A. I asked him about it then.

"Q. What did you ask him about? What did you say to him? A. Well, I just asked him, told him about what —I just told him about the contract and asked him if he would send Gale over there to get the cattle, and he said he would."

We believe the action of Gale Rogers working for the bank in collusion with appellee Ryan to get the cattle moved without payment of pasturage, his threats to get a court order to move them if Mathews got a court order to stop them, all his action, conduct and threats that enabled the truckers to move the cattle while he was delaying appellant's efforts to stop them, and all the surrounding facts and circumstances, considered together with Mathews' statements forbidding the moving of the cattle left after he and Rogers returned from the lawyer's office, constitute conversion.

■ It is a well settled principal of law that a conversion is a trespass within the meaning of Section 9, Art. 1995, R.C.S.; Market Poultry & Egg Co. v. Mueller, Tex. Civ.App., 287 S.W.2d 202; Amberson v. Wilkerson, Tex.Civ.App., 285 S.W.2d 420.

This court has held in Bowers v. Bryant-Link Co., Tex.Civ.App., 6 S.W.2d 788, 789 that, "Where the foundation of the suit involves conversion, in order to sustain venue it is not necessary for the evidence to be clear and convincing that the conversion did occur. It is only necessary that the evidence tends to raise said issue." In making said statement we cited Palmer v. Pinkston, Tex.Civ.App., 282 S.W. 668, 669 and authorities therein cited. The Palmer case just cited also holds that "A suit based upon trespass may be maintained in the county where the trespass was committed, and conversion of property is a trespass within the meaning of said statute."

In affirming the Bryant-Link Co. case, 15 S.W.2d 598, 599, the Commission of Appeals said:

"The respective holders of the chattel mortgages were entitled to sue in trover and conversion for the wrongful conversion of the rent cotton covered by their respective mortgages. Boydston v. Morris, 71 Tex. 697, 10 S.W. 331; First National Bank of Lewisville v. Davis, (Tex.Com.App.) 5 S.W.(2d) 753.

"The facts which have been stated disclose that Collins converted all the rent cotton in question, and that in doing so he was acting at the instance of Bowers. Both therefore are liable as trespassers. Cabell v. Hamilton-Brown Shoe Co., 81 Tex. 104, 16 S.W. 811.

"The trespass, as regards a portion of the converted cotton, is shown to have been committed in Dickens county. Hence suit against both trespassers, in respect of such trespass, was properly brought there. R.S. Art. 1995, Subd. 9; Willis v. Hudson, 72 Tex. 598, 10 S.W. 713; Perry v. Stephens, 77 Tex. 246, 13 S.W. 984. And, too, venue in the suit against the trespassers, Bowers and Collins, for the conversion of all the cotton converted by them, lies in Dickens county, where some of the cotton was converted. All the acts of conversion were committed in pursuance of a general plan concerted by them; which plan comprehended the conversion of all the rent cotton raised by Collins. For this reason, if for no other, suit against them for the conversion of all may be brought in any county where any of the particular trespasses committed in pursuance of the general plan occurred."

■ The trial court having held the contracts unambiguous and refused to consider any oral testimony he had no alternative except to grant the pleas of privilege. His error was in refusing to consider the tendered oral testimony to show the agreement of the parties, if any, as to death loss. We realize of course that upon another

trial on the venue question Mr. Ryan may testify and give contradictory evidence to appellant concerning the agreement as to who was to stand the death loss of cattle. It is true this would be a defense to the merits of the case, which is ordinarily not permissible in a venue hearing. However, in this case it is also a defense to the venue question because the oral testimony we have held to be admissible is necessary to the proof on the question of conversion, the basis upon which appellant is seeking to hold venue in Hansford County. Accordingly, this case is reversed and remanded for another trial on the venue question consistent with our holding herein.