CITY OF DALLAS v. THOMAS H. SHORTALL.

No. 7058. Decided March 23, 1938.
Rehearing overruled April 27, 1938.
(114 S. W., 2d Series, 536.)

*H. P. Kucera, A. J. Thuss, W. Hughes Knight, J. Manuel Hoppenstein,* all of Dallas, and *Black & Graves,* of Austin, for plaintiff in error.

When indications or statements as to the nature or location of materials to be encountered in excavation, honestly made, are to be considered as suggestive only, any expense resulting from error therein will ordinarily fall on the contractor, especially if the contract expressly, in effect, so stipulates. Christie v. United States, 237 U. S. 234, 76 A. L. R. 273; Leary v. Waterliet, 222 N. Y. 377, 135 N. E. 236; Inland Construction Co. v. Pendleton, 116 Or. 668, 242 Pac. 842; Hill v. City of Beaumont, 5 S. W. (2d) 590; J. F. O'Connor & Co. v. Smith & Gathing, 84 Texas 232, 19 S. W. 168.

*Storey, Sanders, Sherrill & Armstrong, R. G. Storey* and *E. Taylor Armstrong,* all of Dallas, for defendant in error.

Since the undisputed evidence discloses that unforeseen conditions were encountered which were not contemplated by either party to the contract; that Shortall sustained a loss, as found by the jury, in excess of amount paid to him by the City of Dallas; that the city knew and recognized him as the contractor who actually performed the work; that after said unforeseen conditions were met with the plans and specifications were changed by mutual consent, it was not error for the Court of Civil Appeals to affirm the judgment of the lower court awarding plaintiff the extra compensation. Maney v. Oklahoma City, 150 Okla. 77, 300 Pac. 642; McClung Const. Co. v. Muncy, 65 S. W. (2d) 786; McGovern v. City of New York, 195 N. Y. S. 925; Pitt Const. Co. v. City of Alliance, 12 Fed. (2d) 28.

*William McCraw,* Attorney General, *Leonard King* and *William Brown,* Assistants Attorney General, filed brief and argument as amucus curiae.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

The City of Dallas, on March 18, 1930, entered into a contract with The Central Contracting Company to construct a certain storm sewer known as Kidd Springs Branch District No. 24. The main feature of this enterprise was the construction of a tunnel several hundred feet in length through a hill, so as to divert waters from Kidd Springs Branch into Coombs Creek retention basin. The depth underground of this tunnel varied with the curvature and height of the hill, and at the highest point of the hill was eighty-five feet beneath the surface of the soil.

In obtaining bids for this work the City of Dallas, through its Engineering Department, caused plans and specifications to be prepared. These plans and specifications consisted, among other things, of a profile or map showing the general contour of the hill and the approximate depth of the tunnel beneath the surface of the hill. Preparatory to making this profile, the Engineering Department made certain tests to determine where rock would be encountered in the hill beneath the surface. In making this investigation small holes were bored with hand augers. These hand augers were used, because at that time the Engineering Department did not have a machine with which to drill holes to the depth of the location of the proposed tunnel. In drilling the holes with the hand augers rock was encountered at depths ranging from two to eight or ten feet. Based upon these borings there was delineated upon the plat what is referred to as the "rock line." It is shown upon the profile as a curved line following the surface line of the soil and being shown below the surface line at depths ranging from two to eight or ten feet. The word "rock" appears on this line at several different places. There is nothing to show whether corings from these borings were kept or not. It is undisputed that the line along which are found the words "rock" was put upon the plat in accordance with the facts found by boring the holes with hand augers, and that the rock was actually encountered in these holes at the depths indicated. No effort was made by the Engineering Department to determine the nature of the soil at the place where the tunnel was to be located, for the reason that there was no machine available for that purpose. We may call attention here to the fact that the jury found that the conditions of the soil and formation which were encountered along the course where the tunnel was actually driven was not reasonably anticipated by either party to the contract.

The proposal for bids, in addition to containing statements of the proximate quantities of rock and dirt excavations, the concrete work to be done, etc., contained the following provisions:

"EXAMINATION OF PLANS, ETC.: All parties who shall bid on any portion of the work called for in these specifications, or shown on the accompanying plans, must familiarize themselves therewith, and they shall also personally examine the route of proposed sewer, noting the condition to be met with during construction.

"INFORMATION: In case these specifications or plans are not thoroughly understood, parties making bids shall apply to the Engineer for further information before bids are submitted, as no claims on any such grounds will be entertained, or changes allowed in the specifications or plans after contract is awarded except under conditions named in the contract as 'Extra,' 'Omitted,' or 'Changed Work.' "

The plans and specifications contemplated two methods of construction of the tunnel, and the proposal for bids contemplated two different bids upon these two different methods. One of the contemplated methods was what was known as "gunnite" construction. By this was meant that if the tunnel was driven through solid rock it could be driven by means of blasting and machinery, and the concrete lining could be put in the tunnel by use of machinery, without forms. If the tunnel had to be constructed through soil not altogether solid rock, the excavation could not be done entirely by blasting with machinery, and the concrete lining would have to be made by use of forms. This concrete lining would also have to be heavier when thus applied than if applied by the gunnite process. In other words, the tunnel could be constructed through a solid rock formation cheaper than through a formation not altogether solid rock. The Central Contracting Company made a bid of $45,014.82 for gunnite construction, and a bid of $49,029.82 for concrete construction. The gunnite construction was chosen by the City, and the contract was entered into upon that basis.

Two days after the contract was entered into and before any work was begun, The Central Contracting Company sublet the contract to defendant in error Thomas H. Shortall, who will be hereinafter referred to as plaintiff. The contract between The Central Contracting Company and plaintiff was in no sense an assignment, but by its terms plaintiff assumed the place of The Central Contracting Company under the contract with the City and agreed to furnish all materials, do all labor, and execute the contract in all particulars, according to plans and speci-

fications, exactly as The Central Contracting Company had obligated itself to do. In consideration of his services, plaintiff was to be paid the sum of $45,014.82, less ten per cent., which was to be retained by The Central Contracting Company.

Before entering into the contract with The Central Contracting Company plaintiff went over the ground of the proposed work. He noticed stakes on the ground indicating the line of the tunnel, and also noticed test holes which had been made with a two or two and one-half inch auger. These test holes were about twenty-five feet apart. The dirt or soil from the holes lay alongside the holes. Plaintiff put a stick in some of these holes, but was unable to push the stick very far. He made no further investigation to determine whether or not the holes had been drilled to the depth of the proposed tunnel. He testified that he was not interested in making his own investigation, because the plans showed a "rock line" and he thought this indicated a rock formation at the location of the proposed tunnel. He made no inquiry of the Engineer Department concerning the result of the tests or concerning the investigation which the Department had made and upon which the plans were based.

Plaintiff was delayed in beginning work of constructing the tunnel, on account of trouble on the part of the City in obtaining right of way, and this matter will be referred to later. After beginning the work, it was discovered that the location of the tunnel was not through solid rock and this caused a change in a part of the construction from gunnite to heavy concrete. This change was mutually arranged between the parties. Other changes were authorized, and for additional work allowed under these changes plaintiff was paid full compensation. In fact, while the bid was only $45,014.82, he was paid the sum of $66,165.36. Due to the fact that the ground conditions did not permit full and complete gunnite construction, plaintiff, according to his contention, was required to sink a shaft near the middle of the hill. Through this shaft he was enabled to do excavation for the tunnel in both directions, but was required to incur large expenses in excavating and in raising and disposing of the soil. He was also required, according to his allegations, to do other work which would not have been necessary if the solid condition had existed. The City declined to make allowance for some of these items and this suit resulted.

The suit was filed in the District Court of Dallas County by plaintiff February 3, 1933. We think it important to note the precise basis of his suit as set forth in his petition. After

alleging execution of the contract by the City and The Central Contracting Company, and the subcontract between The Central Contracting Company and himself, he makes the following allegation:

"That the City of Dallas furnished plans and specifications for the work contemplated to be done under said contract, and said plans and specifications disclosed a local condition wherein the tunnel was to be excavated, which plans and specifications were the only means of information which plaintiff had to inform him of the actual ground conditions to be encountered; that such plans and specifications indicated that solid rock would be found where the tunnel was to be excavated, and this plaintiff relied upon same in entering into the contract aforesaid. That due to circumstances over which he had no control, he performed said work with additional expenses which were necessary and which could not be foreseen, and which were not within the contemplation of any of the parties at the time the contract above referred to was executed; that said expenses and compensation to which plaintiff is entitled are as follows:"

After alleging an expense of $2677.36 on account of delay, he then alleged as follows:

"(b) Expenses made necessary by different condition of the soil from that represented by the City in its profiles and specifications in connection with said work. The profiles prepared by the City of Dallas, and the specifications prepared by the City of Dallas in connection with said work showed that the type of work to be done was what is known as tunnelling or could be done by tunnelling method, and the profiles prepared by the City of Dallas, after making certain borings and tests of the condition of the soil, showed that the condition of the soil was such that tunnelling or tunnelling methods could be used in going through the same. Your plaintiff would show that in entering upon said work he discovered that the condition of the soil was not as represented by the City of Dallas, and the conditions met necessitated a great outlay and expense that was not within the contemplation of any of the parties, said expense consisting of the following:"

He then enumerates these expenses as follows:

(1) Expense of sinking shaft, $2,236.79.

(2) Expense of hauling away soil from shaft, $1139.10.

(3) Additional expense for tunnelling on account of the ground conditions being other than solid rock, $19,600.50.

Trial was before a jury and on findings favorable to plaintiff he was awarded damages, or additional compensation for the items above mentioned, in the sum of $25,653.75, and the sum of $4,150.21 as interest. The Court of Civil Appeals affirmed the judgment of the trial court. 87 S. W. (2d) 844. Justice BOND dissented.

Aside from the item of expense caused by delay, plaintiff's action necessarily, in the last analysis, rests upon a claim for damages on account of misrepresentation by reason of which he was caused to enter into the contract. This becomes manifest from his allegations as well as the authorities upon which he relies.

1 If plaintiff were attempting to recover under or by virtue of the contract, then undoubtedly the provisions with reference to "extra," "omitted," or "changed work," and the provisions with reference to the decision of the engineer, as well as certain charter provisions of the City of Dallas, would control and would prevent a recovery. Constitutional questions might also be encountered. Weston v. State, 262 N. Y. 46, 186 N. E. 197; 88 A. L. R. 1219, and Annotation. Besides, it is practically a universal rule that "when one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered." See United States v. Spearin, 248 U. S. 132, 39 Sup. Ct. 59, 63 L. Ed. 166. The ground upon which recovery was allowed in that case is not recognized in our State. Lonergan v. San Antonio Trust Co., 101 Texas 63, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803.

2 After a careful consideration of practically all of the American cases pertinent to a situation such as is presented in this case, we think that the basis of recovery, when allowed, is perhaps best stated by the Court in the case of Pitt Construction Company v. City of Alliance, 12 Fed. (2d) 28. In that case it was said:

"The contract contains the usual provisions that the engineer shall determine all questions respecting the construction and meaning of the plans and contract, that his decisions shall be conclusive in all cases, and that his estimates shall be a condition precedent to the recovery of any compensation; also that there can be no compensation for extra work, unless a special arrangement was made for it as provided in the general contract. These contract provisions do not control this action. The

suit is not brought to recover anything earned under the contract or for extra work of the character contemplated by the contract; it is brought to recover damages for the misrepresentation by which the contract was induced—or, to express the same substance in another form, to recover damages for not furnishing the agreed site."

In the case of Christie v. United States, 237 U. S. 233, 59 L. Ed. 933, 35 Sup. Ct. 565, which is the principal case relied upon by plaintiff, there is found the following statement, which is at the very foundation of the holding in that case: "It would seem as if there could be only one conclusion from these findings. There was a deceptive representation of the material, and it misled."

As misrepresentation must necessarily be the basis of recovery in this case, except possibly as to the item for delay, we will proceed to determine whether or not plaintiff made such a case, when tested by the principles announced in similar cases. The basis of plaintiff's contention is this: That by the profile or plat mentioned, which was a part of the plans and specifications, the City made an affirmative representation that a solid rock formation existed along the whole course of the tunnel, that he relied upon such representation in making his contract with The Central Contracting Company, that this representation was found to be untrue, and that he suffered injury by reason thereof to the extent of the extra expenses incurred by him in constructing the tunnel under the conditions actually encountered.

We call attention to the fact that plaintiff does not attempt to allege that The Central Contracting Company, the successful bidder, relied upon the alleged representation, or was in any manner misled thereby, or was to any extent influenced in making its bid by reason of said representation. In addition, he failed to allege or prove that The Central Contracting Company suffered any damages whatever by reason of performance of the contract. It follows, therefore, that The Central Contracting Company never had any cause of action against the City, and plaintiff acquired from it no right whatever, either from his first contract, or from the purported assignment made to him during the progress of the trial. His case, therefore, must rest upon the proposition that in making his agreement as a subcontractor under The Central Contracting Company he himself had a right to rely upon the alleged representation, and did so, was misled thereby, and suffered damages as alleged.

**3** While entertaining the gravest doubt that plaintiff *is within* the class of those who were entitled to rely upon the purported representation, yet on account of the importance of the matter, we have decided to discuss the question as if plaintiff occupied the position of the bidder to whom the contract was awarded.

We will not attempt to formulate a general rule applicable to all cases, but will briefly note expressions of the courts in some of the decisions, from which we may get an idea of the controlling principles. Plaintiff relies upon one or more New York cases. That state has perhaps furnished more cases upon the subject than all others. The latest, as well as the clearest, utterance by the courts of that state, is in the case of Arthur A. Johnson Corporation v. City of New York, 295, N. Y. S. 547. The gist of plaintiff's action in that case is briefly stated by the Court as follows:

"This claim arose as the result of the increased cost of excavation due to the presence in the soil of what is known as 'hardpan.' It is alleged that the presence of hardpan was not shown on Supplementary Drawing D-15, which sets forth the results of test borings made by a contractor employed by the city. It is further alleged that the plaintiff relied upon the drawings, that they furnished the basis of the bid it made, and that the Board of Transportation knew that the material to be excavated was different from that shown on the drawings."

Speaking generally, the Court said:

"It is well settled law that under a contract such as we have here, in which it is specifically stipulated that the city does not guarantee the completeness or correctness of the borings, or of the results thereof, the city is nevertheless liable if it *knowingly misrepresents* the conditions, or if it withholds from the contractor any material information of which the city had knowledge and which if disclosed would have tended to indicate the incorrectness of the boring sheets attached to the contract. In other words, implicit in a contract of the kind we are considering is the requirement that the city shall act in good faith."

The Court then proceeds to show that the City did not act in bad faith, either by knowingly making misleading statements, or willfully withholding knowledge within its minds. After referring to the very cases relied upon by plaintiff here, the Court said:

"In each of the other cases cited, it appears that the governmental body involved made affirmative misrepresentations, or had actual knowledge or information through its employees of

the existence of conditions which were withheld from the contractor and which, if brought to his attention, would have put him on inquiry with reference to the accuracy of the boring plans or other data on which he relied in making his bid."

4 In the very recent case of Weston v. State of New York, 262 N. Y. 46, 186 N. E. 197, 88 A. L. R. 1219, speaking of representations such as the one here alleged to have been misleading, the court said, "the most that could be asked for in regard to this information was good faith." Putting the matter conversely, we find that the same condition must exist as is requisite in every case of fraud, towit, some element of deception which in contemplation of law is fraudulent, or amounts to bad faith.

In the case of Hollerbach v. United States, 233 U. S. 165, 34 Sup. Ct. 553, 58 L. Ed. 898, after speaking of specifications which "spoke with certainty," the Court said:

" * * * But the specifications assured them of the character of the material,—a matter concerning which the government might be presumed to speak with *knowledge and authority*. We think this positive statement of the specifications must be taken as true and binding upon the government, and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt. If the government wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants *had a right to rely without an investigation to prove its falsity*." (Emphasis ours.)

In the case of MacArthur Bros. v. U. S., 258 U. S. 6, 42 Sup. Ct. 225, 66 L. Ed. 433, which is the last expression of the Supreme Court upon the matter, the prior decisions relied upon by plaintiff here are reviewed, and it is clearly made to appear that in each of those cases recovery was based on some deceptive representation, made in such manner and accompanied by such circumstances as warranted reliance thereon by the bidder. We refer to this case more fully hereinafter.

5 From these decisions, and many others which might be cited, we deduce the conclusion that in order for plaintiff to be en-

titled to recover damages for extra expenses incurred by him as alleged, it must appear that the so-called representation that the tunnel could be constructed through solid rock, was made as an affirmative statement of fact, or as a positive assertion, and made under such circumstances, or with such accompanying assurances, as justified plaintiff in relying thereon, without investigation on his part; and that he in fact made no independent investigation on his part to ascertain the truth.

The jury made a finding that the plans, specifications and tests made on the ground at the site of the tunnel, made and prepared by the City, disclosed a solid rock condition to be encountered in driving the tunnel. The sole basis for such a finding, and the only thing upon which plaintiff seeks to sustain such finding, is the fact that what is referred to as the "rock line" was delineated on the profile a short depth below the surface of the soil. It is undisputed that this line was delineated on the profile in accordance with the facts disclosed by the auger holes, none of which were more than a few feet deep. It is not claimed that the "rock line" did not reflect the conditions exactly as they were found. Plaintiff himself admitted that rock protruded above the ground in certain places. The profile therefore spoke the truth. But plaintiff contends that the engineer intended to indicate by this line that there was a solid rock structure downward at least to the place where the tunnel would be driven, which was in most places from sixty to eighty feet below where the "rock line" was indicated to be. It is not pretended that the engineer knew or could have known what the condition was at the location of the tunnel. The profile left it purely to conjecture as to how deep the rock structure existed. Plaintiff could form his own conclusion about that as well as the engineer. The specifications made no reference to borings as a basis for the conclusion that the structure was solid rock. In practically all cases supporting a theory of deception there were borings, to which reference was made, and the plans and specifications purported to be based on such borings. Exactly the contrary appears here. The plaintiff was familiar with the tests which were made. He saw the test holes had been bored with only a small auger, and testified that the spoil from the holes were alongside same. From this spoil he must have known that the holes did not go to the depth of eighty-five feet below the surface. In addition, he testified that he pushed a stick into some of the holes and found that they were only a few feet deep. The engineer testified that there was no instrument in North Texas at the time by which borings could have been made to the depth of the tunnel. Plaintiff was a contractor of many years' experi-

ence and must have known this. The engineer further testified that he had no idea as to what condition would be found at the place where the tunnel was to be driven. To say that he made a representation that the structure was solid rock, with no knowledge on which to base such representation, would be to charge him with deliberate falsehood. The jury found that the "condition of the soil and formation which were encountered in the driving of the tunnel by plaintiff Thomas H. Shortall was not reasonably anticipated by *either party* to the contract." It therefore appears certain that instead of the engineer *knowingly* representing that the ground structure was solid rock, he had no intention whatever of doing so. The language of the Supreme Court in the case of MacArthur Bros. v. United States, supra, appears to be directly apropos here:

"But in reality there was no representation by the government, nor is it alleged that the government *had knowledge of the conditions, or means of knowledge, superior to the knowledge of the company.* The latter acquired knowledge only by the aid of divers as its work progressed. Such being the situation, does not the case present one of misfortune rather than misrepresentation? Is it true that the government's proposal was for a certain part of the work to be done in the dry, but it made no representation of the conditions that existed enabling it to be so done or precluding it from being so done." (Emphasis ours.)

In the same case, after making reference to the cases relied upon by plaintiff here, the Court further said:

"The elements which existed in each of the cited cases are absent from the case at bar. In the case at bar the government undertook a project and advertised for bids for its performance. There was indication of the manner of performance, but there was no knowledge of impediments to performance, no misrepresentation of the conditions, exaggeration of them, nor concealment of them; nor, indeed, *knowledge of them.* To hold the government liable under such circumstances would make it insurer of the uniformity of all work, and cast upon it responsibility for all of the conditions which a contractor might encounter, and make the cost of its projects always an unknown quantity." (Emphasis ours.)

6 It, therefore, conclusively appears that the representation in question did not constitute an affirmative and positive assurance on the part of the City, knowingly or recklessly made, that the ground structure at the location of the tunnel was solid rock. It is further conclusively shown that there was no circumstance which justified plaintiff in relying upon such purported repre-

sentation as a fact. Plaintiff made his own investigation to the extent of finding out that the marking of the "rock line" on the plat was based on the information obtained by drilling the auger holes. He then knew as much as the engineer knew. As pointed out in the case of United Construction Company v. City of St. Louis, 334 Mo. 1006, 69 S. W. (2d) 639, "the cores taken out by the drill could not do more than show the character of the rock at the particular place through which the drill passed, and the correct interpretation of such borings must be made by the bidder himself." In this connection, the case of Hill v. City of Beaumont, 5 S. W. (2d) 590, by the Court of Civil Appeals at Beaumont, is directly in point.

The information to the bidders contained the positive requirement that "in case these specifications or plans are not *thoroughly understood*, parties making bids shall apply to the engineer for further information before bids are submitted." Plaintiff admits that he made no inquiry of the engineer. If he had done so, he would have ascertained the fact that the "rock line" shown on the profile merely represented the places where rock had been found in drilling the auger holes, and that this line meant nothing more than that. In view of the foregoing requirement we think the following further language of the court in the case of United Construction Company v. City of St. Louis, supra, is very pertinent:

"The plaintiff was under no obligation to make a bid for doing this work, and, if the plans and specifications and the sources of information referred to were so deficient or inadequate that it could not make an intelligent bid and contract, it should have refrained from doing so."

The following additional cases support the conclusion we have reached: Palmberg v. City of Astoria, 112 Or. 353, 228 Pac. 107; same case 229 Pac. 380; Jahn Contracting Co. v. City of Seattle, 100 Wash, 166, 170 Pac. 549; Inland Construction Co. v. City of Pendleton, 116 Or. 668, 242 Pac. 842; Howland v. City of Asbury Park, 109 N. J. L. 229, 160 Atl. 354; Foundation Co. v. State, 233 N. Y. 177, 135 N. E. 236; Lentilhon v. City of New York, 102 App. Div. 548, 92 N. Y. S. 897.

7  As to the item of $2,677.36 allowed plaintiff for delay occasioned, as alleged by him, on account of the City failing to promptly furnish right of way, we think the dissenting opinion of Justice Bond is unquestionably sound. There was a provision in the contract that The Central Contracting Company would not transfer, sublet, or assign same, or sublet any part of the

work, except for delivery of materials, to any person, firm or corporation, without obtaining the consent of the City of Dallas, expressed by a resolution of the Board of Commissioners, upon such conditions as might be prescribed by said Board. As above indicated, The Central Contracting Company within two days after the contract was signed, sublet the work to be done thereunder to plaintiff without the consent of the City expressed in the manner mentioned. The jury found that the City of Dallas, through its representatives and agents, knew and recognized that plaintiff was performing the entire construction of the tunnel as a *subcontractor*. This does not constitute a finding that the City, during the time there was delay in furnishing the right of way, knew anything about the subletting of the work. But even if this were true, the mere recognition of plaintiff as a subcontractor created no contract relation between him and the City. The case of Road Improvement District v. Mobley Const. Co., 171 Ark. 585, 286 S. W. 878, 48 A. L. R. 456, by the Supreme Court of Arkansas, is so decisively in point on this proposition that we need only to cite same.

Upon this feature of the case, we quote from the dissenting opinion as follows:

"The city made no contract with Shortall, and there is no evidence that, at the time Shortall moved the machinery and retained his skilled employees, for which he predicates his damage for the delay item of $2,677.36, the city knew the Central Contracting Company had assigned the work to him. The Central Contracting Company assembled no machinery, nor is there any claim that it had skilled employees to cause it damage. So, if Shortall, under private arrangements with the Central Contracting Company, incurred that expense, it was of no concern of the city, and the liability of the city therefor would not attach. It is not contended that the city gave consent for the assignment or subletting of the contract, or that any employee knew at the time of the delay the contractor had done so. Then, how could the city be estopped, if, in fact, a municipality may be estopped in the circumstances?"

In addition, we call attention to the fact that while the jury found that the delay was not occasioned by any fault of plaintiff, yet there was no finding that it was caused by any fault or even failure of the City, which would amount to a breach of duty even to The Central Contracting Company, much less to plaintiff.

For the reasons stated, the judgments of the Court of Civil

Appeals and of the district court are reversed and judgment is here rendered in favor of plaintiff in error, City of Dallas.

Opinion adopted by the Supreme Court March 23, 1938.

Rehearing overruled April 27, 1938.