The STATE of Texas, Appellant,

v.

F & C ENGINEERING COMPANY,
Appellee.

No. 143.

Court of Civil Appeals of Texas.

Houston (14th Dist.).

Jan. 15, 1969.

Rehearing Denied Feb. 19, 1969.

Crawford C. Martin, Watson C. Arnold, Woodrow Curtis, C. W. Pearcy, Jr., Albert L. Derden, Austin, for appellant.

W. St. John Garwood, Jr., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellee.

TUNKS, Chief Justice.

On August 3, 1960, F & C Engineering Company entered into a contract with the Texas Highway Department for the construction of the frontage roads on a section of the Southwest Freeway in Harris and Fort Bend Counties—being a part of U.S. Highway 59. The performance of the contract was delayed to the damage of the contractor and it contends that the delay was caused by default of the Highway Department. Having obtained permission from the Legislature, the contractor filed suit against the State to recover its damages occasioned by such delay. The contractor also sought recovery for certain "extra work" done by it and allegedly not covered by the contract. Both parties waived a jury and trial before the court resulted in a judgment in favor of F & C Engineering Company for damages resulting from the delay and for certain items of extra work. The State has appealed.

In this opinion we will sometimes refer to the appellant, defendant in the trial court, as "the State," and to the appellee, plaintiff in the trial court, as "the contractor."

The two principal items of the contract in question were the preparation and stabilization of the road base and the pouring of the contract pavement. It is the latter item with which the case is primarily concerned. The contractor necessarily first began work on the road base. When that work had progressed sufficiently to permit it to do so, it was the purpose of the contractor to begin pouring concrete on the prepared base. In November, 1960, the contractor notified the Highway Department engineer in charge of the job that it would be ready to begin pouring concrete on or about December 1, 1960. Before pouring could begin it was necessary that the materials to be used in the concrete be tested and that the formula for the mixture of those materials be worked out so that the resulting concrete would meet the State's specifications for strength and workability as set forth in the contract. The contract provided that this testing and design was to be done by the engineer for the Highway Department. It is in this process of designing and testing the materials and the concrete to be made from them that the contractor contends the State was derelict.

The design and testing began November 15, 1960, and the pouring of the concrete did not get fully underway until about May 1, 1961. The trial court awarded the contractor damages for the expense it incurred for standby equipment and personnel during the period between January 10, 1961 and April 28, 1961. We hold that the trial court's judgment in that respect was error.

Under the contract the materials to be used in mixing the concrete were furnished to the job site by the contractor. These materials were water, cement, sand and gravel. The contract spelled out specifications for each of such materials. We need

here note only one of those specifications —it was provided that the gravel should contain not more than 1% by volume of shale when tested by a procedure called a "decantation test." Provision was made for the testing of the materials by the engineers for the Highway Department to determine that the specifications were met. Some of the tests were done by the Highway Department laboratory in Austin and others, including the testing of the gravel for shale content, were done at the job site.

The contract further provided that in mixing the concrete the materials should be mixed in the proportions fixed by weight by the State's engineer. The required characteristics of the concrete as so mixed were spelled out in the contract. The mixture was required to produce concrete with a minimum flexural strength of 650 pounds per square inch when tested by a stated procedure. It was required to contain *not less than* five sacks of cement per cubic yard of concrete. The water-cement ratio might not exceed six and one-half gallons of water for each 94 pound sack of cement. It was required to have a workability characteristic for which a testing procedure was stated. Other specifications are not deemed significant in this case. In fact, of the four specifications listed here, the minimum strength and minimum cement content are the most significant.

Thus, under the contract, the contractor selected and furnished the materials to be used in making concrete. The State's engineer determined whether those materials met the requirements of the contract. If they did he worked out the proportions of those materials to be used in the mix which would result in concrete meeting the contractual requirements. The contract then recited:

" '(5) Mix Design. It is the intent of this specification to develop and use the most economical mix design possible which will fulfill all requirements of this speci-

fication when using acceptable materials as furnished by the Contractor.' "

The formula by which the proportions of the material used in mixing the concrete was fixed was called the "batch design" by the witnesses. This batch design was arrived at by the engineer in accordance with procedure set forth in the Texas Highway Department Bulletin C–11, referred to in the contract. The basic factor in the design is the water-cement ratio. If other factors remain the same the strength of the concrete will vary with the variation of this ratio—the lower the ratio of water to cement the greater the strength of the concrete. Thus, in working out the batch design to be used, the engineer would design different mixes representing a wide range of water-cement ratios. Tests would be made of the strength of the concrete produced by these tentative mixes. The results of those tests were plotted on a graph and lines drawn between them. From that line the water-cement ratio required to produce the required flexural strength of 650 pounds per square inch could be determined.

Of the various materials used in the concrete, the cement was the most expensive. The contractor was paid on a unit basis at the rate of $4.30 per square yard of concrete pavement laid to a thickness of nine inches. Since the cement was the most expensive of the materials in the concrete mix, it was to the financial interest of the contractor that the amount of cement per cubic yard of concrete be kept as low as possible.

The procedure for testing the flexural strength of the concrete produced by a given batch design was set forth in the contract. The contractor, using the tentative designs furnished it by the State's engineer, mixed concrete and poured beams of specified dimensions. These were called pilot beams and normally 80 of them would be poured at one time. The pilot beams were allowed to set for seven days then they were placed on a machine called a

beam breaker. Pressure was gradually applied to the beam until it broke. The pressure point at which it broke indicated its flexural strength.

On November 23, 1960, the contractor poured pilot beams using concrete mixed in accordance with alternative tentative batch designs furnished it by the State's engineer. Those beams were tested for strength on November 30th. Those tests showed that the beams poured from a batch design using 5.004 sacks of cement per cubic yard of concrete had a flexural strength of only 476 pounds per square inch. The beams poured from a batch design using 6.027 sacks of cement per cubic yard of concrete had a flexural strength of 602 pounds per square inch—still short of the contractual specification. From the curve plotted from those results it was determined that, in order to get the required strength of 650 pounds, a batch design having a water-cement ratio that would require about six and one-half sacks of cement per cubic yard of concrete would have to be used.

The record shows that, using the materials available in the area of this highway job, the required concrete strength of 650 pounds ordinarily can be achieved by using five sacks of cement per cubic yard of concrete. In fact, it is so unusual that more than five sacks per cubic yard are required that the witnesses referred to such excess as "penalty" cement or "augmentation" cement. In computing bids for paving jobs for the State, contractors regularly assume that the concrete can be mixed on a design requiring only five sacks of cement per cubic yard. Usually the first set of test beams broken will permit the selection of a batch design using only five sacks of cement per yard. Rarely is it necessary to break more than one or two sets of pilot beams before accomplishing such result. In this case, 27 of such tests were done and over 1,000 beams were poured and broken before the job finally got underway using five sacks of cement per cubic yard of concrete on or about May 1, 1961.

The contractor could have started pouring on November 30, 1960, if it had wanted to use six and one-half sacks of cement per cubic yard of concrete. It did not do so, but rather, along with everyone else connected with the job, began investigating to determine why such a high cement content was needed to produce the required strength. The computations of the State's resident engineer on which the batch designs were based were checked by the contractor's engineers, by other State engineers and by private testing laboratories. All checks confirmed their accuracy. It was suspected that the State's beam breaking machine was inaccurate and another one was brought in to check it. There was nothing wrong with it. The contractor had a right, under the contract, to suggest its own batch design if it wished to do so. It employed a private testing laboratory to formulate such a design. That design, temporarily, seemed to offer the solution and the contractor was allowed to start pouring on it. Within a few days, however, it became apparent that that design was not producing the required strength in the concrete and pouring was stopped. During the delay caused by these experiments, the contractor declined to pour concrete based on a design requiring more than five sacks of cement per cubic yard of concrete.

As noted above, the contract specifications required that the gravel used in mixing the concrete have not more than 1% by volume of shale content. The first test of the gravel furnished by the contractor at the job site showed a content of 0.8% shale. The State's engineer testified that he considered this result to be sufficiently close to the margin of allowance to cast some suspicion on the quality of the gravel but not to be a basis for rejecting it. It was finally concluded by all parties that the gravel was the cause of the trouble. It became apparent that it was impossible to design a mixture of concrete, using the gravel which the contractor had furnished, that would produce the required strength in concrete with only five sacks of cement

per cubic yard. It was only after the original gravel had been replaced by a new supply about May 1, 1961, that the job got underway and proceeded with no more than normal trouble with concrete mixes.

The plaintiff's trial pleading was its amended original petition. In that pleading it is alleged that plaintiff incurred excessive expense in the performance of the contract because of the long delay in getting started. It alleged that this delay was "* * * due to the inadequacy of Defendants' mix designs to meet the standards called for in the contract, or, alternatively, due to the insufficiency of the testing furnished by Defendants. * * *"

By a supplemental petition filed as a trial amendment the plaintiff alleged that, in accordance with customary usage, it was the mutual intent of the parties that the pouring of the concrete should begin with a batch design using "no more than" five sacks of cement per cubic yard of concrete. If further alleged that the contract was ambiguous on this point so that "* * * such practical construction should be resorted to and applied herein to resolve same as above pleaded."

The trial court, by its findings of fact and conclusions of law, sustained the plaintiff's contention that the contract was made with the mutual understanding that not more than five sacks of cement should be used per cubic yard of concrete. The trial court's judgment imposed upon the State liability for the extra expense incurred by the contractor during the period of the delay caused by the inability of the State's engineers to design a formula that would provide the required strength in concrete, and, at the same time, use only five sacks of cement per cubic yard.

We are of the opinion that the trial court's conclusions of law are erroneous and that the facts of this case afford no basis for imposing liability on the State for damages incurred by the contractor as a result of the delay in getting the job started. The contractor was, under the contract, the one who selected and furnished the gravel. It met the specifications of the contract. Concrete meeting contract specifications could be mixed using it. The contractual arrangement between the contractor and the supplier of the gravel are not shown by the record. The supplier of the gravel was not shown to be a party to any contract with the State Highway Department. Under the circumstances it is doubtful that the State engineer had any right to reject the gravel, but he certainly had no duty to the contractor to do so. The engineer had no duty to intervene into the contractual arrangement between the contractor and gravel supplier for the purpose of saving the contractor some expense. In fact, when the gravel was finally replaced by a new supply, it was not because the State rejected it but was pursuant to some agreement between the contractor and the supplier.

The section of the contract in question having to do with the specifications for the concrete to be used in the paving was clear and unambiguous. A minimum strength was spelled out as a controlling factor. The use of the words "not less than" in fixing the minimum of five sacks of cement per cubic yard of concrete provided a variable upward from the stated minimum cement content by which to achieve the minimum strength factor if needed. The purpose of this language was to guarantee that the State would get concrete pavement of a satisfactory quality. There is nothing in the record to suggest that the State's engineers negligently or intentionally failed accurately to compute the batch design or to conduct the strength tests.

There is no question that the batch designs furnished provided for the mixing of concrete with the required strength. Those designs were objectionable to the contractor only because they required the use of more than five sacks of cement per cubic yard of concrete to achieve the required strength. The fact that its performance of the contract would be more expensive to the contractor than it had ex-

pected neither excused its non-performance of the contract nor entitled it to more compensation than that provided in the contract. City of Dallas v. Shortall, 131 Tex. 368, 114 S.W.2d 536. There is nothing in the contract that guarantees that the Texas Highway Department engineers will furnish the contractor with a design that will, using the materials furnished by the contractor, give a strength of 650 pounds on five sacks of cement per cubic yard of concrete. The most that can be implied from the language "most economical design" is a duty to furnish the most economical design that will, using the materials furnished, produce the strength of 650 pounds and the required workability. There is no evidence that this duty was breached.

■ The term "not less than" five sacks of cement per cubic yard of concrete, as used in the contract, was unambiguous. It fixed a minimum. A witness for the State explained why a minimum of five sacks was fixed. He testified that even though less than five sacks of cement per cubic yard of concrete would sometimes produce the required flexural strength in concrete, such concrete was susceptible to deterioration through fatigue from long and heavy use. We cannot accept a construction of that term, regardless of prevailing custom or usage, by which it would be held to mean "not more than" five sacks per cubic yard. Since the term used fixed a minimum it necessarily presupposes the possibility that more than five sacks may be required. United States v. Binghamton Const. Co., Inc., (U.S.Sup.Ct.) 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594.

■ It is the appellee's contention that the above quoted language in the contract referring to the concrete mix design imposed upon the State the duty to furnish such a mix design as would require only five sacks of cement per cubic yard of concrete, since that was the "most economical mix design possible." In such construction, however, the appellee lifts that one paragraph from the contract and urges a construction of it that disregards other language of the contract. That is not proper. In the construction of a contract, the purpose is to find the intention of the parties as expressed by them in the words used. To accomplish this purpose all parts of the contract are to be taken together. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515 (Tex.Sup.Ct., 1968).

■ Other parts of the contract that must be considered along with the language obliging the State to furnish the most economical mix design possible are these: the materials, including the gravel, to be used in mixing concrete were furnished by the contractor. The specification for gravel allowed a maximum 1% shale content. The mix must have "not less than" five sacks of cement per cubic yard of concrete. The mix used must produce concrete having a flexural strength of 650 pounds per square inch. When those provisions are considered, we believe that the contract imposed upon the State only the duty to furnish the contractor with the most economical mix design that would, using the materials furnished by the contractor and meeting contract specification, have not less than five sacks of cement per cubic yard of concrete, be properly workable, *and* produce concrete having 650 pounds of flexural strength. There is no evidence that the State breached its duty under such a construction of the contract.

■ Since that portion of the contract setting out the specifications for concrete was unambiguous and clearly spelled out the duty of the contractor it was not permissible to resort to custom and usage as the basis for changing its terms. George v. El Paso County Water Control & Imp. Dist. No. 1, Tex.Civ.App., 332 S.W.2d 144, writ ref., n. r. e.; Mathews v. Ryan, Tex. Civ.App., 320 S.W.2d 44, no writ hist.; General Finance & Guaranty Co. v. Smith, Tex.Civ.App., 309 S.W.2d 531, writ ref., n. r. e.

For these reasons we hold that the trial court erred in rendering judgment for the

contractor for the damages represented by its expenses which it incurred for the standby machinery and personnel during that period of time in which the commencing of the job was delayed because of the State's fruitless efforts to design a concrete formula which would produce the required strength by use of the materials furnished to the job site by the contractor and which would require not more than five sacks of cement per cubic yard of concrete.

The trial court found, as a fact, that the contractor had, under oral instructions from the State's engineer, performed certain items of "extra work" not covered by the original plans and specifications of the contract. The court concluded that the contractor was entitled to compensation for expense incurred in connection with those items of extra work.

During the course of the performance of the contract a dispute arose between the contractor and the State's engineer as to whether certain items of work, most having to do with the grading and stabilization of the road base, were outside the specifications of the contract to the extent that the contractor should be paid for them upon a "force account" basis, rather than on the unit basis provided for in the contract. The claims as to those items were submitted by the contractor to the State's engineer. He sustained the contractor's position as to some of the items and rejected it as to others. As to those items which he deemed to be extra work the engineer issued written extra work orders and the contractor was paid on the basis thereof. As to the other items for which the engineer did not issue such written extra work orders, the contractor seeks recovery in this suit. Based on the findings of fact and conclusion of law above set forth, the trial court awarded the contractor such recovery. We hold that the trial court erred in doing so.

The relevant language of the contract as to this phase of the law suit is as follows:

" '4.4. Extra Work. Additional work made necessary by changes and alternations of plans or of quantities or for other reasons, for which no prices are provided in the contract, shall be defined as "Extra Work" and shall be performed by the Contractor in accordance with these specifications and as directed; provided, however, that before any extra work is begun, a "Supplemental Agreement" shall be executed or a written order issued by the Engineer to do the work on a "Force Account" basis, as hereinafter provided.' "

The contract also provided that "The Engineer will decide all questions which may arise as to * * * the interpretations of the plans and specifications * * His decisions will be final * * *."

A further provision was:

" '5.2. Engineer as Referee. The Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto, and his decisions shall be final and binding.' "

The contractor alleged in its petition that these items were "additional items, outside the scope of the contract." If so, they were controlled by the provisions of Section 4.4 of the contract above quoted and the appellee cannot recover for them because there was no "supplemental agreement" or written order to perform them. The authority relied on by the appellee as support for its contention that oral instruction was sufficient is City of Houston v. L. J. Fuller Inc., Tex.Civ.App., 311 S.W.2d 285, no writ hist. There the court had under consideration a construction contract providing that extra work must be ordered in writing. The court defined "extra work" as "work arising outside of and independent of the contract." It then held that the contractor was entitled to compensation, under a unit price contract, for work done under oral order *because* the work was not "extra work" as so defined.

■ Even if we consider the items for which this contractor seeks extra compensation not to be such extra work as to require a supplemental contract or written order, we are of the opinion that no recovery for them should have been allowed. In State v. Martin Bros., 138 Tex. 505, 160 S.W.2d 58, a similar claim under similar contract provisions was involved. The Supreme Court said at pp. 60, 61:

"Plaintiffs claim their rights under the contract executed by themselves with the Highway Department. The contract specifically provides, in addition to the other provisions set out in this opinion, that the Highway Engineer shall pass upon questions of dispute arising with reference to the enforcement of such contract.

"/2/ The contract also provides that the decision of the Highway Engineer shall be final and conclusive. The Highway Engineer denied the claim of the plaintiffs. They cannot escape the binding effect of the decision of the Highway Engineer, without alleging and proving that his decision in this case was based upon partiality, fraud, misconduct, or gross error. No such attack was made upon the decision, either by pleadings or by proof, and, therefore, under the decisions of this Court plaintiffs are not entitled to recover herein. Austin Bridge Co. et al v. Teague, [137] Tex. [119], 152 S.W.2d 1091; City of San Antonio v. McKenzie Construction Co., 136 Tex. 315, 150 S.W.2d 989; 9 Amer. Jur., p. 26, § 36.

"/3/ The Court of Civil Appeals erred in holding that an issue of fact was raised as to the right of plaintiffs to recover the sum of $7,500, claimed by them under their second ground. The parties having expressly agreed to the contract above mentioned, it is incumbent upon plaintiffs to show that they had a supplemental agreement with the Highway Department to cover such extra work, or to show by pleadings and proof that the Highway Department was estopped to deny their claim, in order to justify a recovery against the State. Neither showing was made by plaintiffs."

In the record before us there is no pleading or proof or finding by the trial court that the State's engineer acted through partiality, fraud, misconduct or gross error. Nor is there any such pleading, proof or finding that the State either waived any of the contract provisions or was estopped to assert them.

The conclusions we have reached with reference to the matters above discussed make it unnecessary to discuss other points of error raised by the appellant and the counter-points asserted by the appellee. The judgment of the trial court is reversed and judgment is rendered that the appellee recover nothing from the appellant.

On Motion for Rehearing

The appellee has filed a motion for rehearing correctly pointing out that we erred in stating that the contract between the contractor and the supplier of the gravel was not in evidence. That contract was in writing and is among the exhibits received in evidence. It obliges the supplier to furnish gravel meeting the specifications set out in the contract between the contractor and the State subject to the approval of the Highway Department. We find nothing in that contract which changes the conclusions we have reached.

By its motion for rehearing appellee requests that we make numerous findings of fact. That request is denied. Our findings as to controlling facts are reflected by our original opinion.

Appellee's motion for rehearing is overruled.