# IN THE SUPREME COURT OF TEXAS

════════════
No. 10-0648
════════════

EL PASO FIELD SERVICES, L.P. AND
GULFTERRA SOUTH TEXAS, L.P. F/K/A/
EL PASO SOUTH TEXAS, L.P.,
PETITIONERS,

v.

MASTEC NORTH AMERICA, INC.
AND MASTEC, INC.,
RESPONDENTS

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

JUSTICE GUZMAN, joined by JUSTICE MEDINA and JUSTICE LEHRMANN, dissenting.

Since early in Texas's statehood, this Court has recognized that specific laws prevail over conflicting general laws.[1] For over eight decades, we have applied the same principle when construing contracts.[2] In this contract dispute over a due diligence obligation, two clauses required El Paso to perform due diligence in locating foreign crossings while another clause stated that MasTec assumed all risk pertaining to the work, notwithstanding other provisions in the contract. Our time-honored rules of construction require us to interpret the specific due diligence provisions

---

[1] *Story v. Runkle*, 32 Tex. 398, 400 (1869).

[2] *Kuntz v. Spence*, 67 S.W.2d 254, 257 (Tex. 1934); *Great S. Life Ins. Co. v. Cherry*, 24 S.W.2d 512, 513 (Tex. Civ. App.—Eastland 1930, writ ref'd).

as an exception to the general all risk provision, thereby giving both meaning. But today, the Court departs from that time-honored tradition and negates the due diligence provisions in their entirety. Whatever method an owner chooses to locate foreign crossings, the industry standard is to disclose 85–90% of them. El Paso disclosed only 35%. The jury was entitled to—and did—find that El Paso did not exercise due diligence. Because I cannot agree with the Court's significant departure from our long line of precedents governing our approach to contract construction, I respectfully dissent.

## I. Factual Background

This case involves the replacement of a metal pipeline. When a pipeline crosses a foreign object (such as other pipelines, roads, rivers, fences, and other structures), that object is referred to as a foreign crossing. Replacing the portion of a pipeline at a foreign crossing often requires the investment of a significant amount of resources, most notably manpower. It is customary for pipeline owners to compile information on foreign crossings (known as alignment sheets) as the foreign crossings to their pipelines are built or modified. As a matter of due course, at the time a pipeline is going to be replaced, owners make their alignment sheets available to bidding contractors so they evaluate the potential need for additional time or resources and factor that additional criteria into the bid. In some cases, a contractor will be able to inspect the pipeline easement before bidding the job, but such an inspection will not always detect fiberglass or plastic pipelines. Metal detectors cannot detect such lines if they have no metal tracers, and pipelines are not always marked on the surface. The most accurate pre-bid method of identifying foreign crossings is from the owner's alignment sheets.

2

Here, El Paso purchased a 68-mile pipeline built during World War II. El Paso decided to replace the line because it was too shallow. El Paso had received the preliminary alignment sheets dating to before the pipeline was built. It had no alignments sheets showing foreign crossings built since 1940. An El Paso representative described its alignment sheets as "very inadequate, but it is all we had to work with."

Accordingly, El Paso hired a surveying company to assess the route and identify foreign crossings. The surveyor testified that El Paso did not ask him to detect lines with no metal. The surveyor walked the line using metal detectors and noting physical markings of lines. At a pre-bid meeting, El Paso disclosed to pipeline contractors the surveyor's alignment sheets—which showed 280 foreign crossings. The industry practice for contractors is to allocate a 10–15% contingency in a bid to account for, among other things, unexpected and unidentified foreign crossings.

El Paso owned another pipeline of the same size in the same right of way. El Paso had a survey for that adjacent pipeline that showed significantly more foreign crossings than the survey of the pipeline at issue here.[3]

After soliciting bids, El Paso selected MasTec, which submitted the lowest bid. Importantly, the contract they agreed to twice specified that "[El Paso] will have exercised due diligence in locating foreign pipelines and utility line crossings." The contract also provided "that anything in this Contract or in any representations, statements or information made or furnished by [El Paso] or any of its representatives notwithstanding, [MasTec] assumes full and complete responsibility for

---

[3] Valero also owned a pipeline in the same right of way. A Valero representative was on site while MasTec was replacing El Paso's pipeline, and Valero's alignment sheets showed significantly more foreign crossings than El Paso disclosed. El Paso never contacted Valero regarding this information.

3

any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith."

Once the pipeline replacement construction commenced, MasTec hired Steve Edwards, who specialized in detecting foreign crossings, to work ahead of the construction crew to confirm the location of foreign crossings. Edwards used a metal detector, referred to as an M-scope, to locate metal lines as well as fiberglass and PVC lines with metal tracers. But the device could not detect lines containing no metal. Edwards testified that the only method to identify such lines is to speak with landowners to generally determine where pipelines are situated and then pressure wash and remove the soil to locate the lines.

In a typical job, Edwards testified he would discover 5–10% more foreign crossings than an owner had disclosed. Here, Edwards located approximately 794 total foreign crossings[4]—284% more than El Paso disclosed. The jury found that El Paso failed to comply with the contract. At trial, the jury was asked whether El Paso exercised due diligence in locating foreign crossings. The jury found that El Paso breached the contract.

## II. Discussion

The primary goal when construing a written contract is to ascertain the true intent of the parties as expressed in the writing. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We accomplish this by examining the entire writing so as to harmonize all provisions and render none meaningless. *Id.*; *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 193 (Tex. 2002). "No

---

[4] As the Court notes, other evidence in the record indicates there could have been even more than 794 foreign crossings, but MasTec only claims there were 794 foreign crossings in this appeal. __ S.W.3d at __, n.2.

4

single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To harmonize conflicting provisions, we treat narrow provisions as exceptions to general provisions. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994); *see also Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011); *Kuntz v. Spence*, 67 S.W.2d 254, 257 (Tex. 1934); *Great S. Life Ins. Co. v. Cherry*, 24 S.W.2d 512, 513 (Tex. Civ. App.—Eastland 1930, writ ref'd).

Construing the contract here requires that we examine the term due diligence. Because the contract did not define due diligence, we must ascribe the term its ordinary meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). As the Court notes, Black's Law Dictionary defines due diligence as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." BLACK'S LAW DICTIONARY 523 (9th ed. 2009). We have stated that "'diligence' is relative and incapable of exact definition. Its meaning must be determined by the circumstances of each case. Reasonable diligence has been defined as such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances." *Strickland v. Lake*, 357 S.W.2d 383, 384 (Tex. 1962). Due diligence "is usually a question of fact." *Id*.

In construing the term as requiring MasTec to shoulder the risk for El Paso's lack of diligence, the Court ignores well settled rules of construction that no clause should be rendered meaningless and that a narrow provision is construed as an exception to a conflicting general

provision. And because there was some evidence that El Paso failed to use due diligence, we should not disturb the jury's finding.

## A. The Court Negates the Due Diligence Requirements

The Court maintains that its reading of the contract does not negate the due diligence requirements but instead contemplates a joint effort with El Paso conducting a survey and MasTec assuming the risk for the inaccuracies in the survey. But substantively, this reading negates the due diligence clauses. What if El Paso hired a surveyor that found zero foreign crossings? Is it plausible that the parties would intend that such a finding constitutes due diligence? Under the Court's rationale, such an illogical approach would have been the intended outcome merely because El Paso hired a surveyor. The Court is in effect rewriting the contract to negate the due diligence requirements and, in so doing, violates our long-standing rules of interpretation.

We determine the intent of the parties by assessing the entire writing and giving effect to all provisions. *Valence Operating*, 164 S.W.3d at 662. In order to assure that no one provision controls all others, we have long treated specific provisions as exceptions to general provisions. *Forbau*, 876 S.W.2d at 133–34; *Kuntz*, 67 S.W.2d at 257; *Cherry*, 24 S.W.2d at 513. The clause the Court relies on is unquestionably general (that MasTec assumes all risk, notwithstanding other provisions). The clauses stating that El Paso must use due diligence in locating foreign crossings are specific. But rather than giving both provisions meaning (as we must) by treating the diligence provisions as a limited exception to the risk provision, the Court negates the diligence provisions in their entirety. To do so forces MasTec to shoulder the due diligence burden the contract squarely places on El Paso. Here, the contract requires that we give meaning to both provisions and allow the jury to decide

6

whether El Paso's disclosure satisfied its due diligence obligation. The Court ignores well settled rules and, in error, disregards the jury's verdict.

To illustrate the importance of ascribing some meaning to a due diligence clause, an example is helpful. The parties' contract contains a force majeure clause that relieves each party of liability for failure to perform due to a force majeure event. This force majeure clause would presumably include hurricanes. Hurricanes are risk. Under the Court's view, MasTec would assume the risk of a hurricane in the all risk clause, despite the fact that it specifically bargained to not assume the risk of a hurricane in the force majeure clause.[5] But such an interpretation renders the force majeure clause meaningless—an outcome we seek to avoid. *Valence Operating*, 164 S.W.3d at 662; *Coker*, 650 S.W.2d at 393. The rules of construction are in place to determine the intent of the parties when harmonizing conflicting provisions. *Valence Operating*, 164 S.W.3d at 662. They do precisely that here by specifically allocating narrow risks (such as force majeure events and due diligence for locating foreign crossings) and then shouldering MasTec with all other risk.

There are circumstances in which an all risk provision may trump a due diligence provision. For example, the due diligence clause could: (1) state the information provided was a courtesy but due diligence was within the contractor's scope of work;[6] (2) disclaim any accuracy of the due

---

[5] Granted, the all risk clause relates to "conditions pertaining to the Work." But MasTec encountered one hurricane and two tropical storms during the work, which dropped 66" of rain on the work site. No one disputes that this rain had a significant impact on the work site.

[6] *See, e.g.*, *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 488 (Tex. 2005).

7

diligence; or (3) have the other party disclaim any reliance on the due diligence.[7] This contract contained no such disclaimers.

The description of El Paso's alignment sheets as due diligence along with the lack of disclaimers brings this case outside the ambit of our holdings in *Lonergan v. San Antonio Loan & Trust Co.*, 104 S.W. 1061 (Tex. 1907), and *City of Dallas v. Shortall*, 114 S.W.2d 536 (Tex. 1938). *Lonergan* involved an owner supplying an architect's defective specifications to a contractor. *Lonergan*, 104 S.W. at 1065. We based our holding that the owner was not liable to the contractor for the defective specifications on two principles. *Id*. First, the contractor in all probability knew better than the owner that the architect's specifications were defective. *Id*. Here, El Paso had superior knowledge of the foreign crossings as it owned the pipeline and owned another pipeline in the same easement with alignment sheets showing significantly more foreign crossings. Second, in *Lonergan*, the contract in no way made the owner the guarantor of the accuracy of the specifications. *Id*. at 1066. Here, the contract stated that the owner's investigation and disclosure of the foreign crossings was "due diligence." *Lonergan* does not support El Paso.

Likewise, *Shortall* does not support El Paso. There, the owner stated: "In case these specifications or plans are not thoroughly understood, parties making bids shall apply to the Engineer for further information before bids are submitted, as no claims on any such grounds will be entertained . . . ." 114 S.W.2d at 538. El Paso made no such disclaimer advising that the foreign crossings "are not thoroughly understood" but instead stated that its alignment sheets constituted due

---

[7] *See, e.g.*, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011) (discussing the effect of disclaimers of reliance on fraudulent inducement claims).

diligence. El Paso's use of the term due diligence and the lack of any disclaimers effectively vitiate its reliance on *Lonergan* or *Shorthall*.

## B. There Is Some Evidence El Paso
## Did Not Use Due Diligence

Construing the contract to mean that the due diligence clauses required El Paso to use due diligence (as they must), we must determine if there is some evidence supporting the jury's finding that El Paso breached its obligation. We have defined due diligence as what an ordinarily prudent and diligent person would do in similar circumstances. *Strickland*, 357 S.W.2d at 384. We have also discussed due diligence in the oil and gas context in terms of industry practice. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 206 (Tex. 2011).

Here, the testimony indicates that the industry standard is for contractors to allot a 10–15% contingency for such things as foreign crossings an owner did not disclose. In other words, the industry standard is for owners to disclose 85–90% of foreign crossings. El Paso disclosed 35% of the foreign crossings. The gross disparity between the industry standard and El Paso's disclosure evinces that El Paso failed to use due diligence and the jury's finding must not be disturbed.

The Court attempts to distinguish this undisputed testimony in two ways: (1) that industry standards are not necessarily synonymous with industry practices; and (2) that the standard for due diligence for older pipelines is the same as for newer pipelines. The record is devoid of support for either position. First, the Court is unable to cite any authority for treating industry standards and practices differently in the due diligence context. If an owner used a novel method of locating pipelines and found 100% of them, it would be difficult to claim that it failed to use due diligence.

9

Regardless of the practice El Paso employed (hiring a surveyor and not instructing it to locate non-metal lines), it grossly failed to meet the industry standard (identifying 85–90% of pipelines). The failure in the Court's interpretation is that El Paso warranted the work in locating foreign crossings as due diligence: "[El Paso] will have exercised due diligence in locating foreign pipelines and utility line crossings." Under the guise of industry practice, the Court changes the focus of due diligence to the hiring of a surveyor—not the locating of foreign crossings.

Neither is there support for the Court's assertion that the standard for older pipelines is the same. The Court again conflates categories to rewrite the contract. Due diligence looks at similar situations. *Strickland*, 357 S.W.2d at 384. Older pipelines can have non-metal foreign crossings that were placed before laws required metal tracers in non-metal lines. El Paso's method of using a metal detector and visual inspection may well be suitable for locating foreign crossings for a newer pipeline (which involves few unidentified, non-metal foreign crossings). But El Paso's method was unsuitable for an older pipeline with a significant number of non-metal lines, as evinced by El Paso's 1940s survey of an adjacent pipeline identifying significantly more foreign crossings than the recent survey of the pipeline at issue. Due diligence, as it is commonly understood, requires that El Paso use greater efforts in locating foreign crossings in an older pipeline, such as instructing the surveyor to locate non-metal lines. El Paso could have avoided its obligation, assuming it considered it onerous, by simply disclaiming due diligence. It did not do so here.

In any event, El Paso's methodology was so deficient that it identified only 35% of foreign crossings, far less than the industry standard of 85–90% and even less than El Paso's survey from

its adjacent pipeline in the 1940s. There is some evidence to support the jury's finding that El Paso breached its obligation.

### III. Conclusion

Well settled rules of contract construction require us to construe the due diligence clauses in this contract as a limited exception to the all risk clause. Ignoring these well settled rules, the Court renders meaningless a more specific provision. The industry standard is for owners to disclose 85–90% of foreign crossings. Here, El Paso disclosed a mere 35%. In sum, the jury was entitled to find that El Paso breached its due diligence obligation, and we should not set aside its finding. I respectfully dissent.

_____
Eva M. Guzman
Justice

OPINION DELIVERED: December 21, 2012