Robert A. MANN et al., Appellants,

v.

Harris R. FENDER, Appellee.

No. 5895.

Court of Civil Appeals of Texas, Waco.

Sept. 6, 1979.

Rehearing Denied Oct. 4, 1979.

P. M. Johnston and Joe Michael Russell, Sleeper, Williams, Johnston, Helm & Estes, Waco, Robert G. Vial, Paul D. Schoonover, Stephen L. Baskind, Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, for appellants.

John F. Sheehy and J. Robert Sheehy, Sheehy, Lovelace & Mayfield, Waco, F. Wilbert Lasater, Lasater & Knight, Tyler, Donald S. Thomas, Clark, Thomas, Winters & Shapiro, Austin, for appellee.

HALL, Justice.

The parties to this appeal are defendants-appellants Robert A. Mann and Walter J. Rusek, Trustee for certain trusts for Mann's children, and plaintiff-appellee Harris R. Fender. It is uncontradicted that Fender owns 4,947.74 of the 19,166 controlling shares of capital stock of Kilgore National Bank of Kilgore, Texas. This lawsuit is based on a claim of ownership by Fender of all of the remaining 14,218.26 shares under two separate theories, and a cross action by defendants to set aside a sale by them to Fender of their shares and for money damages based on Fender's assertedly malicious refusal to honor a take-out agreement on a certain $600,000.00 note which allegedly placed defendants under economic duress. After a jury trial, judgment was rendered awarding Fender all of the stock and denying defendants any recovery on their cross action. Defendants appealed. We affirm the judgment.

### Fender's Claims To All Kilgore Bank Shares

Mann and Fender have known each other for many years, and they have been involved together in several ventures in the investment banking business. In December 1968, Mann, Fender, and Houston Southwest Corporation (now Southwest, Bancshares, Inc.) entered into a lengthy "Control Agreement" under which they purchased 9,200 shares (51½ percent) of the capital stock of Kilgore National Bank of Kilgore, Texas at the price of $125.00 per share. Under the terms of the Control Agreement, Houston Southwest owned 4,450 shares of the stock and Fender and Mann each owned 2,375 shares. Fender and Mann financed their purchases of the stock with $593,-750.00 they jointly borrowed from Bank of The Southwest. It was provided in the Control Agreement that all the Kilgore Bank stock would be taken in Mann's name; and Mann agreed that after the purchase was completed in January, 1969, the shares respectively owned by Houston Southwest and Fender would be reissued by him to them upon their requests. It was agreed that Mann would be chairman of the Board and Chief Executive Officer of the Kilgore Bank and that in the event any dispute "with reference to the election of directors or with reference to some other matter concerning the Kilgore Bank and/or its policies" could not be resolved amicably by the parties, then "the question or issue involved in the dispute . . . will be decided and resolved in accordance with the decision and direction of Mann and the stock of Houston Southwest and Fender will be voted accordingly."

In Paragraph B the Control Agreement provided: "Upon any change in the ownership of any shares of Control Stock each of the parties hereto grants to each other party hereto the preferential right to participate in the purchase of such shares. Any change of ownership of any right, title or interest, legal or beneficial, as well as any change of the shareholder of record of shares of Control Stock owned by any party hereto, shall be a change in ownership giving rise to the right of the undersigned to purchase such shares, except the following: . . . (2) Any transfer to any other party to this agreement. (3) Any transfer by gift, devise or descent to the spouse or lineal descendant of [a party to the agree-

ment] or to a trustee in trust for the benefit of any such person. . . . (5) Any transfer from Robert A. Mann to any trust or corporation owned or controlled, directly or indirectly by him, or by any trust or corporation owned or controlled, directly or indirectly by him, or any transfer to Robert A. Mann from or by any such trust or corporation." Under other terms of the Control Agreement each party agreed that before he sold or otherwise disposed of any of his stock "in a transaction other than one excepted under the preceding paragraph" he would give written notice to the other parties of his intention to sell setting forth the name of the proposed purchaser and the proposed terms of sale; and that the other parties would then have ten days to exercise their preferential right to purchase a "pro rata share" of the stock offered for sale based upon the ratio the stock owned by him bore to the shares "then owned by all members exercising their rights to purchase such stock" at the price and according to the terms of the proposed sale, before the proposed sale could be consummated. Finally it was provided that regardless of the method of transfer or sale, the stock would remain subject to the conditions and preferential rights set forth in the Control Agreement and that notice of that fact would be printed on the shares.

After a stock dividend by the Kilgore Bank in January, 1970, Houston Southwest's ownership was increased to 9,270.-515690 shares, and Fender and Mann each owned 4,947.742155 shares.

In 1971 Houston Southwest was required by the federal banking authorities to divest itself of its shares of the Kilgore Bank stock. Thereafter, on August 12, 1971, Mann and Houston Southwest entered into the following contract: first, Houston Southwest agreed to support a proposed merger of the Kilgore Bank with First Southwest Bancorporation (a corporation controlled by Mann) under which Houston Southwest would receive First Southwest Bancorporation stock for its Kilgore Bank stock, and Mann agreed "to use his best efforts" to effect registration of the stock of First Southwest Bancorporation so that

it could be publicly traded; and, second, Mann agreed that if the merger was not approved by November 15, 1972, he would either purchase or find a purchaser for Houston Southwest's 9,270 shares for $610,-000.00 ($65.80 per share). It was stated in the contract that the parties understood that the Kilgore Bank stock was then subject to the terms of the Control Agreement; that any stock received by Houston Southwest under the proposed merger in exchange for Kilgore Bank stock would be subject to the terms of the Control Agreement, and that "under the terms of the Control Agreement no stock subject thereto may be sold by any party to said agreement without the same having been first offered, on a pro rata basis to the other parties to said agreement." The contract then provided: "It is agreed that such [Control] agreement is to be amended so that, following the [merger] and exchange of Kilgore stock for First Southwest stock, the [Control] agreement will be terminated in its entirety. In the event such amendment is not effected by the date of the consummation of the reorganization and merger, Mann will, immediately after the reorganization and merger, purchase from Southwest its shares of First Southwest for the sum of $610,000.00 cash. It is agreed further that should said [Control] agreement still remain in effect on November 15, 1972, Mann will at the time of the sale of Southwest's stock secure a release from Harris R. Fender or see that the rights of Harris R. Fender under the terms of said agreement are protected. Mann further agrees in this connection to protect Southwest and hold it harmless from any claim asserted or which might be asserted against it by reason of any claimed noncompliance with any terms of said agreement."

The proposed merger was disapproved by the federal banking authorities on February 18, 1972, and it was never consummated.

Fender was not a party to the merger-sale agreement between Mann and Houston Southwest, and he first learned of its terms in a letter from Mann to him dated March 2, 1972, reading:

"Dear Harris:

"On December 23, 1968 an agreement was made to which you were a party, along with this writer and Houston Southwest Corporation. Beginning on page 8 of this Agreement with paragraph designated 'C' and continuing on page 9, as well as in other portions of the Agreement, you had certain rights regarding purchase of stock from other members of the group.

"On August 12, 1971, this writer entered into an Agreement with Southwest Bancshares, Inc. regarding their ownership interest in their stock of Kilgore National Bank. A copy of this Agreement is enclosed.

"On February 18, 1972, the Board of Governors of the Federal Reserve System of Washington, D.C. issued their order and statement concerning First Southwest Bancorporation, Inc.'s application to merge, along with others, with the Kilgore National Bank. A copy of this order and statement is enclosed.

"It may be that certain commitments in the Agreement of August 12, 1971 between Southwest Bancshares, Inc. and Robert A. Mann will require stock of Kilgore National Bank to be purchased by Robert A. Mann, though not necessarily.

"The purpose of this letter is to advise you of all of these actions, agreements, statements and orders which might possibly affect you in some way. The further purpose of this letter is to inquire whether or not you would want to assume and be a party to your pro rata potential interest which I figure roughly to be one-half should actions be triggered between Southwest Bancshares, Inc. and Robert A. Mann in Agreement of August 12, 1971.

"As I understand our agreement, I am giving you ten (10) days notice to make your decision and shall assume that if I do not hear from you by registered mail no later than March 14, 1972 that you decline and waive all rights and/or responsibilities that may develop as a result of the Agreement between Robert A. Mann and Southwest Bancshares, Inc., dated August 12, 1971, copy of which is enclosed herewith.

Sincerely,
s/ Robert A. Mann
Robert A. Mann"

Fender responded to Mann four days later with this letter.

"Dear Mr. Mann:

"Receipt is acknowledged of your letter of March 2, 1972, advising me that you have executed a commitment with Southwest Bancshares, Inc. (successor of Houston Southwest Corporation) which may require that you purchase stock held by it in the Kilgore National Bank.

"This letter will advise you that I, individually and as Trustee, desire to exercise my preferential right to purchase the pro rata share of any Kilgore National Bank stock offered for sale either by you or by Southwest Bancshares, Inc. in accordance with the terms of the agreement dated December 23, 1968, entered into by and between you, the Houston Southwest Corporation and myself.

"If and when such information is available to you, please advise me as to the proposed terms of sale, the price per share and the number of shares which I am entitled to purchase, and the manner and method in which payment for the stock should be made.

"With every best wish, I remain,
Yours very truly,
S/ Harris R. Fender
Harris R. Fender"

Thereafter, until the middle of October, 1972, there was a great amount of correspondence between Fender and Mann and their attorneys concerning their respective rights under the Control Agreement and the merger-sale contract regarding the 9,270 shares to be sold by Houston Southwest. It was Fender's position that under the Control Agreement he had the preferential right to purchase one-half of the shares for $305,000.00 ($65.80 per share) when they were finally sold by Houston Southwest (without regard to the other

terms of the merger-sale contract between Mann and Houston Southwest) which Mann had recognized in his letter of March 2, 1972 and in other correspondence; and that he (Fender), in his letter of March 7, 1972, had exercised his preferential right within ten days and had accepted Mann's offer. Mann disputed Fender's claim of preference, and asserted that Houston Southwest's stock sale to him was "a transfer to another party" expressly excluded from preferential pro rata participation under paragraph B(2) of the Control Agreement; and he contended (1) that Fender's only right to participate was based upon the offer in Mann's letter of March 2, 1972, which, Mann asserted, was to let Fender join in the merger-sale agreement and assume with Mann the obligations for working for the merger and the registration and public trading of the stock of First Southwest Bancorporation, and (2) Fender having failed to accept the offer within ten days waived any rights he might have had under the Control Agreement to purchase any of Houston Southwest's 9,270 shares of Kilgore Bank stock. The dispute remained unresolved.

Facing the November 15, 1972, deadline under the contract of August 21, 1971, for purchasing Houston Southwest's shares, Mann approached Republic National Bank of Dallas in late October or early November, 1972, to arrange financing for the purchase. He dealt with Ed Bentley at Republic Bank. It was also Mann's desire that the loan which he and Fender owed to Bank of The Southwest for their original purchase of Kilgore stock be refinanced by Republic Bank. The balance on that loan, excluding interest, was $391,874.50. Mann arranged a loan from Republic Bank for $1,001,874.50 (denominated by the parties as "the million dollar note") representing $610,000.00 for the purchase of Houston Southwest's 9,270 shares, and $391,874.50 for refinancing the Bank of Southwest loan. It was agreed between Mann and Republic Bank that all of the Kilgore Bank stock, which was still in Mann's name (including the 4,947 shares individually owned by Fender), were to be pledged to secure the loan. It is undisputed that, as a condition for the loan, Republic Bank required that both Mann and Fender jointly execute the million dollar note. It is also undisputed that Fender did not have knowledge of the proposed loan by Republic Bank until after it was arranged by Mann.

On either the 12th or 15th of November, 1972, Mann met with Fender to obtain Fender's signature on the million dollar note. The result of that meeting was an issue on the trial of this case. Fender testified that the immediate discussion at the meeting was whether or not he would own one-half of Houston Southwest's 9,270 shares if he signed the note; that Mann unequivocally agreed that they would divide the shares "fifty-fifty" each owning "4,635 shares"; and that it was only upon that agreement that he signed the note. Mann testified that at the meeting he expressly refused to agree to let Fender purchase any portion of the 9,270 shares; and that he told Fender, "You didn't commit when I had to take commitment, so I'm not going to agree to it." In any event, Fender signed the note and thereby became liable on it jointly and severally with Mann. The proceeds of the note were disbursed as follows: $391,874.50 was used to pay off the Mann-Fender indebtedness at the Bank of the Southwest; and $610,000.00 was used as the purchase price of the 9,270 shares. All 19,166 shares held under the Control Agreement were pledged as collateral for the note.

The million dollar note became due on January 15, 1973. On that day, Fender went to Republic Bank, contacted Ed Bentley there, and executed a renewal note. Later, he sent Bentley his check for his share of the accrued interest on the note. On January 31, 1973, after Bentley was in possession of the renewal note signed only by Fender, and Fender's interest check, Mann contacted Bentley at the Bank and paid the note and his share of the interest. Bentley testified that Mann said, or at least led him to believe, that Mann and Fender were paying the note. There is evidence that Bentley told Mann about the renewal note executed by Fender, and Bentley testi-

fied there would have been no problem on the renewal had Mann desired to do so. When Mann paid the note, he accepted all of the stock which had been pledged as collateral. A substantial part of the Kilgore Bank stock originally owned by Mann under the Control Agreement and the 9,270 shares purchased from Houston Southwest were then transferred by Mann to various trusts for his children and to First Southwest Bancorporation (the previously mentioned corporation controlled by Mann). First Southwest Bancorporation is not a party to this appeal and has no interest in it other than through Mann.

Fender first learned of the note payoff by Mann when he received the million dollar note from Bentley marked "Paid by Robert A. Mann, 1–31–73." He immediately wrote Mann on February 5, 1973, reiterated his claim to one-half of the shares purchased from Houston Southwest, plus those owned by him under the Control Agreement; tendered to Mann by draft on Republic Bank one-half of the million dollar note; and requested that one-half of the pledged stock be transferred to him by Mann not later than February 12, 1973. Mann admitted on the trial that he received the letter, and that the draft on Fender would have been good. However, he did not comply with Fender's request, other than to later transfer to Fender (prior to the filing of this suit) the 4,947 shares originally owned by Fender under the Control Agreement, for which Mann was paid by Fender. The dispute over ownership of the 9,270 shares continued.

On April 30, 1974, Mann wrote Fender that he was giving Fender ten days notice (as required under the Control Agreement) that Mann and those to whom he had assigned a part of the 14,219 shares allegedly owned by him had received an offer from Joe Pearson and R. S. Martin (not parties to the Control Agreement) to purchase all 14,219 shares at $140.00 per share or a total of $1,990,660.00 to be paid $497,665.00 in cash and the balance by an interest bearing note due in six months secured by a lien on the shares. On May 9, 1974, Fender responded by reiterating his claim to 4,635 shares (at $65.80 per share) under the asserted purchase from Houston Southwest, elected to purchase the remaining 9,584 shares under Mann's letter at $140.00 per share; stated that he was instituting suit for recovery of the 4,635 shares and for purchase of the remaining 9,584 shares under Mann's letter, or, alternatively for purchase of all the 14,219 shares under Mann's letter. This tender by Mann and Fender's acceptance in the fashion stated is undisputed in the record.

## The Take-out Commitment

On March 23, 1972, Fender executed a take-out commitment in which he agreed to purchase a $600,000.00 promissory note made the same day by First Madison Corporation payable to Great Southwest Mortgage & Investment Company, Inc. This $600,000.00 note was indorsed to certain trusts for Mann's children through Mann as Trustee. It was secured by a deed of trust lien on 425 acres of land situated in Rains County, Texas. Under the take-out commitment, Fender agreed to purchase the take-out note, if called upon to do so by "Robert A. Mann or his nominee" between February 24, 1974, and March 24, 1974. For this agreement, Fender received $30,000.00 and the option to buy one-half of the Rains County land for $1,000.00. The take-out agreement enabled First Madison (maker of the take-out note) to obtain funds to purchase the land in Rains County. The children's trusts agreed to loan First Madison the $600,000.00 purchase price, if First Madison would repay or refinance the amount within two years. The effect of the take-out agreement was that the trusts for Mann's children would fund the purchase of the Rains County property (for First Madison) from March, 1972, through March, 1974, and thereafter, by performance of the take-out agreement, the purchase would be funded by Fender. The trusts advanced $600,000.00 and became holders of the note. To fund this advance, the trusts had obtained a loan of $600,000.00 from Continental National Bank in Fort Worth which, according to the evidence, was personally guaranteed by Mann. Further, the take-

out note was assigned to Continental Bank as collateral for the Mann trusts' loan.

The take-out agreement provided that Fender would be given a notice of 30 days prior to his obligation to purchase the take-out note; and it required among four conditions for the purchase that the note not be in default at the time of purchase by Fender. On February 15, 1974, Continental Bank, as Mann's nominee, acting through Frank C. McDowell, gave written notice to Fender to purchase the note on or before March 24, 1974. Fender turned the matter over to his business manager, Charles R. Woolridge, to determine whether the conditions of his purchase had been met, and if met (according to Woolridge's testimony) to execute the commitment. Several telephone conversations between Woolridge and McDowell resulted in a letter to McDowell by Woolridge (in Fender's name) on March 14, 1974, inquiring whether the conditions had been satisfied, and specifically requesting, "(4) certificate that the note is not in default." McDowell responded by letter on March 18th in which he stated positively that the three conditions other than default (insurance, tax receipts, and survey on the real estate securing the note) had been met, and then stated, "(4) *To the best of my knowledge*, the note which will be assigned to you is current in all respects with no conditions of default." (Emphasis added). There were then other conversations by telephone between McDowell and Woolridge in which McDowell was requested by Woolridge to unconditionally certify, on behalf of Continental Bank, that the note was in all respects current. Meanwhile, according to Woolridge, there had been a conversation between him and an officer of First Madison (the maker of the note) "concerning a possible question of usury with the note . . . charging more than a legal rate of interest." On March 25th, Mann sent a telegram to Fender stating, "Just been advised you are refusing to honor [the take-out commitment]. If true, I will suffer great damage as a result of your breach and will look to you for same. Advise immediately." By telegram the next day to McDowell, Fender again sought certification from Continental Bank that "all interest quarterly installments have been paid to a current date"; and also asked what the Bank "proposed to do with regard to the claim by maker of note that interest is usurious"; and stated that if all conditions had been met he was "in a position to close this matter." McDowell did not respond, but Mann sent Fender a telegram on March 27th stating, "Re your telegram March 26, all interest paid to current date. I warrant no usury. All conditions met. Please proceed."

The record shows that the question as to the current status of the note on March 24, 1974, centered solely upon whether the interest payments were current. Continental Bank held the note as collateral, but the interest payments were not made to it. Rather, according to Mann and his witnesses on the question (Walter J. Rusek, a certified public accountant, who is now trustee for the Mann children's trusts, an officer in several entities controlled by Mann, and the person primarily charged with keeping the financial and accounting records of Mann and the trusts; L. L. Wood, an attorney, personal guarantor on the $600,000.00 take-out note, and a shareholder in First Madison, maker of the note; and Fred Neely, a former owner of First Madison and a participant with Mann and others in a joint-venture known as Premier Properties), the interest due and received on the note to the Mann trusts (owners of the note) was treated primarily as an offset against interest owed by Mann to Premier Properties. The offsets were handled by bookkeeping entries kept by Rusek. Rusek's books reflected receipt of the interest on the note and the offsets for 1972, but they did not show payment of the interest for 1973 or any year thereafter. Rusek testified in detail that the entries since 1972 have not been made because of a problem with a federal income tax return filed by Premier Properties and a question by the Internal Revenue Service which will result in the filing of certain amended income tax returns.

McDowell's only knowledge as to whether the interest on the take-out note had been paid (and Fender's only knowledge) was Mann's oral statement to him that it was paid. McDowell testified that was the reason he could not give Fender an unconditional statement on behalf of Continental Bank that the interest was paid, because "it's just that you can't give a certification on behalf of the Bank based on somebody else's oral statement."

Fender refused to execute the take-out agreement. Continental Bank then called upon Mann to pay the $600,000.00 loan, there, secured by the take-out note. It was paid by Mann and the trusts in the following fashion: In May, 1974, the accrued interest and $50,000.00 principal was paid, and the balance was renewed. Following other interest payments and an additional payment of $75,000.00 on the principal, the loan was paid in full in November, 1974. Eventually, in February, 1976, Mann and the trusts bought the 425 acres in Rains County at the trustee's sale under the deed of trust for $212,500.00. An appraisal expert valued the 425 acres at $223,000.00 at the time of trial. The evidence shows that First Madison and L. L. Wood (personal guarantor on the First Madison note) are both bankrupt.

Michael Vaughn testified that he is not personally acquainted with Fender; that in January, 1976, (which was after the present suit was filed) he "desperately needed" an extension on a note he had given for the purchase of a bank from Mann's First Southwest Bancorporation; that he and Mann agreed upon a detailed (and involved) transaction under which Mann would receive $450,000.00 from Vaughn on a temporary sale of the Rains County land, but Mann would eventually own the land (and thereby be made whole on the $600,000.00 take-out note), and Vaughn would get the extension on his note; but that the arrangement was "scrapped for another deal" at Mann's insistence because Mann said "he was involved with a lawsuit with Mr. Fender and he was going to put that property on Mr. Fender and he just thought it best to make me buy another piece of property

from him instead of that one." Vaughn's testimony was largely disputed by Mann.

In addition to the Federal Reserve Board's denial in February, 1972, of Mann's proposed merger between First Southwest Bancorporation and Kilgore Bank, Mann suffered a series of personal and business setbacks in 1973 and 1974, and thereafter. They included the criminal indictment of Mann in June, 1973 by the federal government for an alleged violation of the federal banking laws, which received widespread publicity in banking circles (Mann had been acquitted by the time of the trial of our case in August, 1977); the Federal Reserve Board's denial on March 1, 1974, of a proposed merger between First International Bancshares, Inc., Dallas, Texas (a broadly-based holding company) and the First National Bank of Waco, which would have been of substantial financial benefit to Mann (First Southwest Bancorporation owned 86% of the stock of First National Bank of Waco; and Mann and the trusts owned 69.7% of the stock of First Southwest Bancorporation); Fender's failure to take out the $600,000.00 First Madison note in March, 1974, and Mann's resulting responsibility to Continental Bank on the note; Mann's knowledge at that time that he faced a pretrial hearing on the indictment in May, 1974; the eventual liquidation of First Southwest Bancorporation in the Fall of 1974, and its sale of the stock of First National Bank of Waco at substantially less than would have been received in exchange if the merger with First International Bancshares had been approved; and the asserted loss based upon the value of the 425 acres securing the First Madison note.

Mann characterized his emotional state and financial affairs in March, 1974, when Fender refused to execute the take-out commitment, as "harried and chaotic." Nevertheless, Rusek's testimony established that financial statements of Mann and the children's trusts dated January 31, 1974 (which, under the record, are their financial statements nearest in time to March 24, 1974) showed that Mann's net worth was

$8,708,445.00, which included $288,375.00 invested in certificates of deposit "that can be turned to cash at anytime"; that the trusts had a combined net worth of $5,470,423.00, including $149,425.00 in certificates of deposit; and that the financial statements were exhibited to banks and lending institutions as reliable. Rusek also testified in very general fashion that there were commitments on the cash, and that tax liabilities and note payments were coming up, too.

### Pleadings, Verdict, and Judgment

Fender pleaded for relief on these theories: (1) He alleged that he was entitled to purchase 4,635 shares (one-half of the 9,270 shares originally held by Houston Southwest) for $65.80 per share by reason of (a) the exercise of his "preferential right" to participate in the contract between Mann and Houston Southwest dated August 12, 1971; and (b) by reason of the oral agreement between him and Mann in November, 1972, that they would purchase the 9,270 shares on a "50–50 basis" by executing the million dollar note at Republic Bank; and (c) that, alternatively, by reason of the use of their joint funds (the million dollar note) for the purchase of the 9,270 shares, a trust resulted in his favor under which Mann held 4,635 shares for Fender at the price paid. (2) He alleged that he was entitled to purchase the remaining 9,584 shares held by Mann, not claimed by Fender, for $140.00 per share under Mann's offer dated April 30, 1974, which was accepted by Fender. And, (3) Fender alleged, alternatively, that if he was not entitled to purchase the 4,635 shares for $65.80 under the reasons assigned by him, then he was entitled under Mann's offer of April 30, 1974, and his acceptance, to purchase the disputed 4,635 shares at $140.00 per share. Proper tender of payment under all theories was made by Fender.

Responding, Mann and the other defendants disputed Fender's claims of ownership of one-half of the 9,270 shares purchased from Houston Southwest; and they pleaded a cross action in which they alleged that Fender's failure to take out the First Madi-son $600,000.00 note placed Mann and the children's trusts in "a great financial bind"; that Fender knew that would result if he did not honor the take-out commitment; that Fender deliberately, maliciously and willfully breached the take-out agreement to coerce defendants to sell him their Kilgore Bank stock; that as the result of Fender's "willful and malicious and intentional acts" they (1) were forced to pay off the $600,000.00 note and thereby suffered certain damages on the note for which they sued; (2) were forced to enter into the agreement of April 30, 1974, to sell their Kilgore stock, which they sought to set aside; (3) were forced to sell their control stock in The First National Bank of Waco, Texas, under poor market conditions "rather than being able to keep said stock, or to sell said stock in more of a seller's market," causing them damages in excess of $4,000,-000.00 for which they sued; and (4) suffered "untold financial and personal harassment and embarrassment" and damage to their good financial reputation for which they should recover $1,500,000.00 exemplary damages from Fender.

Fender denied the allegations set forth in defendants' cross action, pleaded that any damages suffered by them were not caused by Fender; and asserted that his refusal to honor the take-out commitment was proper because (a) Fender was not furnished evidence that the interest payment on the take-out note was current on March 24, 1974; (b) that some interest on the note was in fact delinquent at that time; (c) that prior to March 24, 1974, Fender was "put on notice" that the maker of the note was claiming the note was usurious, and that an ordinarily prudent person would not have purchased the note under those circumstances; and (d) that the take-out note was in fact usurious at that time.

The case was tried to a jury on August 22, 1977. The jury made the following answers to the special issues:

1. Found that "the $610,000.00 used to purchase the 9270 shares of Kilgore National Bank from [Houston Southwest] was obtained by the use

of the joint credit" of Fender and Mann "in signing the one million dollar note."

2. Found that in November, 1972, Mann "made an oral agreement" with Fender that if Fender would sign the million dollar note "each of them would own one-half (½) of the 9270 shares of Kilgore National Bank being purchased from [Houston Southwest]."

3, 4. Found (3) that prior to March 24, 1974, Fender "was put on notice of a claim of usury by the maker of the $600,000.00 First Madison [take-out] note"; and found (4) that "upon receiving such notice of usury . . . a person of ordinary prudence in the exercise of ordinary care would not have taken out such $600,000.00 note."

5. Failed to find "that immediately prior to March 24, 1974," the $600,-000.00 take-out note was not in default.

6. This issue, conditioned upon an affirmative answer to issue 5, was not answered. It inquired about defendants' direct monetary loss on the $600,000.00 take-out note.

7. Failed to find that "the act of Fender in failing to honor his take-out agreement constituted duress." The term "duress," as used in the issue, was defined to mean "any unlawful or unconscionable coercion of another, either mental, physical, economic or otherwise, causing him to act contrary to his own free will or to submit to a situation or condition against his own volition or interest."

8. Failed to find that the Mann defendants were required to sell their Kilgore Bank stock to pay their obligation to Continental Bank on the $600,000.00 note.

9. Failed to find that Fender knew on or about March 24, 1974, that if he failed to honor his take-out agreement the Mann defendants would be required to sell the Kilgore Bank stock to satisfy the $600,000.00 obligation at Continental Bank.

10, 11, 12. These issues, conditioned upon an affirmative "duress" answer to issue 7, were not answered. They inquired about defendants' damages "proximately caused by their having to sell the stock in the Kilgore Bank," and "incurred as a result of the sale of the First National Bank of Waco, Texas."

13. Failed to find that the Mann defendants were entitled to exemplary damages. The jury was given the following instruction in connection with this issue: "Before you can assess exemplary damages, you must believe and find from a preponderance of the evidence that the act of Fender in failing to honor the take-out commitment was malicious and intentional or was actuated by some evil intent or gross negligence in disregard of the rights of the Mann Defendants which would be the equivalent of such evil intent."

14. This issue asked about the amount of exemplary damages. Conditioned upon an affirmative answer to issue 13, it was not answered.

As we have stated, prior to the filing of this suit Mann had transferred to Fender and had received payment for the 4,947 shares originally owned by Fender under the Control Agreement. Based upon the verdict and upon the conclusion recited in the judgment that "the undisputed evidence [established] that by letter dated April 30, 1974, Defendants made an offer to sell to Plaintiff all of the shares of stock owned by the Defendants in the Kilgore First National Bank, which offer was accepted by Plaintiff" judgment was rendered which in its effect awarded Fender the disputed 4,635 shares for the total price of $305,000.00 ($65.80 per share), and awarded him the remaining 9,584 shares for the total price of $1,341,760.00 ($140.00 per share). The judgment also provided that Mann and the other defendants take nothing on their cross action.

Although Mann states in his brief under a point of error related to 100 shares of the stock (discussed later herein) that he "does not concede that Fender accepted Mann's offer" dated April 30, 1974, to sell all of his stock, Mann does not assign error to the court's holding set forth in the judgment that the offer and acceptance were established under the evidence as a matter of law.

### Complaints And Rulings

Defendants assert the court erred in rendering judgment on the jury's finding of the November, 1972, oral agreement that Mann and Fender would each own one-half of the 9,270 shares, in answer to Special Issue No. 2, because (1) Fender did not plead the oral agreement, and (2) the oral agreement was in violation of V.T.C.A., Bus. § C. § 8.319, the statute of frauds governing a contract for the sale of securities. We overrule those contentions.

As we previously stated, Fender pleaded the agreement. In paragraph V of his petition Fender pleaded Mann's contract of August, 1971, with Houston Southwest to purchase Houston Southwest's 9,270 shares, Mann's offer to let Fender participate in the contract, and Fender's asserted acceptance in March, 1972, and then continued as follows:

"The parties disagreed about the form of Harris R. Fender's agreement to purchase one-half of said stock, but on or about November 15, 1972, the Defendant Robert A. Mann came to Harris R. Fender and *represented* to him that the two of them *should jointly purchase* the [Houston Southwest] stock; that they should borrow the purchase price of said stock from the Republic National Bank of Dallas, Texas; that they should also refinance their original stock with the Republic National Bank of Dallas, Texas; and that the stock being purchased would be taken and held under the Control Agreement along with Fender's original stock being held by Robert A. Mann under the Control Agreement. *Pursuant to said agreement*, Harris R. Fender and Robert A. Mann jointly signed [the mil-

lion dollar note] dated November 15, 1972." (Emphasis added).

Later, in paragraph IX of the petition, Fender alleged the following facts:

"Further, Plaintiff would show that he and Defendant Robert A. Mann *did jointly agree* to borrow money from the Republic National Bank of Dallas *to jointly purchase* the stock owned by [Houston Southwest] and that the funds of Harris R. Fender were used to purchase one-half of said stock and that Harris R. Fender became owner of one-half of the stock so acquired from [Houston Southwest] by Defendant Robert A. Mann. Further, the use by Defendant Mann of the money from the joint obligation of Plaintiff and Defendant Mann to purchase the stock owned by [Houston Southwest] resulted in Defendant Mann holding one-half of the stock purchased from [Houston Southwest] in trust for the Plaintiff. Thus, both under the *express agreement* between Plaintiff and Defendant Robert A. Mann as well as under the trust that resulted from Defendant Mann's use of the Plaintiff's funds, the Plaintiff is the owner of one-half of such stock." (Emphasis added).

Those pleadings clearly set up the agreement in question.

█ Under the provisions of Rule 94, Vernon's Tex.Rules Civ.Proc., the defense of the statute of frauds must be affirmatively pleaded, else it is waived. *First National Bank In Dallas v. Zimmerman*, (Tex. 1969) 442 S.W.2d 674, 676. The statute of frauds was not pleaded by Mann, and it was therefore waived. Accordingly we do not decide its application in this case.

█ Defendants requested an instruction to the jury defining the term "oral agreement" as used in Special Issue No. 2 to mean "a verbal expression of the meeting of the minds of both Harris R. Fender and Robert A. Mann with respect to their joint ownership and obligations in connection with the Kilgore Bank stock purchased from [Houston Southwest]." The requested definition was refused by the court, and defendants assign error to that ruling. The

complaint is overruled. Special Issue No. 2 inquired, "Do you find from a preponderance of the evidence that in November 1972, [Mann] made an oral agreement with [Fender] that if [Fender] would join in signing the one million dollar note, each of them would own one-half (½) of the 9270 shares of Kilgore National Bank being purchased from [Houston Southwest]." The testimony on this issue from both Mann and Fender, although wholly contradictory, was directly stated by them. Fender said their meeting lasted about 10 minutes, that they discussed only the signing of the note and the ownership of the 9,270 shares, that the meeting ended with the oral agreement that Fender would sign the note and they would own the shares "50–50," and that they "shook hands" on it and further agreed "to let bygones be bygones." Mann said that the meeting lasted several hours, that their discussions covered many problems and differences, and that he steadfastly refused to agree to Fender's proposal "to buy half that stock," and that he told Fender, "No, you can't buy—I'm not going to agree for you to buy this stock at this late date. You didn't commit when I had to take commitment, so I'm not going to agree to it." The question for resolution by the jury was whether the disputed agreement was made by the parties. The term "oral agreement" was not used in the special issue in any peculiar legal sense; but it simply referred to the disputed agreement which, under the pleadings and proof, was made by the parties with "the meeting of the minds" or was not made at all. Its definition was not reasonably necessary to aid the jurors in their deliberation. *Griffin v. Cawthon*, 77 S.W.2d 700, 701 (Tex.Civ. App.—Fort Worth 1934, writ ref.); *Pullen v. Russ*, 226 S.W.2d 876, 883 (Tex.Civ.App. —Fort Worth 1950, writ ref'd n.r.e.); 3 McDonald, Texas Civil Practice 323 (1970 ed.), § 12.14.3(c) Jury trial: Charge—Definitions. The requested definition was properly refused.

■ Defendants assert the jury's finding that the oral agreement was made is against the great weight and preponderance of the evidence. We disagree. Mann and Fender were the only persons present when the agreement was allegedly negotiated. Fender testified it was made; Mann testified it was not. Additionally, Ed Bentley testified that when Mann arranged with him at Republic Bank for the million dollar note, Mann Told him that Fender and Mann would own the 9,270 shares "jointly and equally." The testimony raised the question of the credibility of the witnesses which was resolved by the jury against Mann. We hold the jury's finding is not against the great weight and preponderance of all of the evidence on the issue.

Defendants assign several errors related to the submission of special issue no. 1. That issue submitted Fender's claim of ownership of one-half of the 9,270 shares based upon the theory of a resulting trust in his favor because of the use of his credit in the execution of the million dollar note, which was an alternative ground for recovery to that based upon the oral agreement. Inasmuch as the jury's finding of the oral agreement supports the judgment, any defects in the issue on the resulting trust are immaterial and need not be discussed. *Tex-Jersey Oil Corporation v. Beck*, 157 Tex. 541, 305 S.W.2d 162, 165 (1957).

■ Defendants contend the court erred in rendering judgment on the jury's answer to special issue no. 5 because the evidence conclusively establishes that the First Madison take-out note was not in default when Fender was called upon to purchase it on March 24, 1974; and, alternatively, defendants assert the answer to the issue, in which the jury failed to find the note was not in default, is against the great weight and preponderance of the evidence. Defendants' position that the proof conclusively shows that interest due on the note was offset against interest due on Mann's note to Premier Properties, without regard of the fact that the offset was not entered by Rusek in Mann's financial books during 1973, is based mainly upon the testimony of Mann, Rusek, L. L. Wood, and Fred Neely. Neely and Wood were two of the three owners of First Madison when the note was

executed, and Wood was personal guarantor on the note. Mann, Neely and Wood were partners with others in Premier Properties. (There was other evidence of close dealings between Mann and Neely: Michael Vaughn testified it was Neely who initially told him in January, 1976, that Vaughn could probably get the much-needed extension on his note with First Southwest Bancorporation if he would arrange to pay Mann personally $500,000.00). Rusek was Mann's employee. The testimony of defendants' witnesses regarding payment of the interest by offset could not be readily contradicted if untrue, other than by the evidence of the book entries of the offsets which showed that the offsets were recorded for 1972 by Rusek but not recorded for 1973 nor thereafter. Testimony of this nature, coming from witnesses who were interested in the matter, raises only questions of fact and is not conclusive. *Gevinson v. Manhattan Construction Co. of Oklahoma* (Tex.1969) 449 S.W.2d 458, 467. In the light of the whole record, we also hold that the jury's answer to special issue no. 5 is not against the great weight and preponderance of the evidence.

Defendants also assign error to the submission of special issues 3 and 4 (based upon Fender's pleaded "notice of usury" as justification for not purchasing the take-out note) on the ground those issues did not submit an ultimate, tenable defense. In the light of the jury's answer to special issue no. 5 which supports the judgment based on the issue of Fender's failure to take-out the First Madison note, the complaint in question is immaterial for the reasons discussed above in connection with special issue no. 1. *Tex-Jersey Oil Corporation v. Beck*, supra.

■ Defendants contend the jury's answers to special issue no. 7 (failing to find that Fender's failure to take-out the First Madison note constituted economic duress against defendants), and to special issue no. 8 (failing to find that the Mann defendants were required to sell their Kilgore Bank Stock to satisfy their obligation to Continental Bank on their $600,000.00 note, there), and to special issue no. 9 (failing to

find that Fender knew when he refused to honor the take-out commitment that the Mann defendants would thereby be required to sell their Kilgore Bank Stock in order to pay the note at Continental Bank), are against the great weight and preponderance of the evidence. We cannot agree with those contentions.

The evidence in this case is lengthy and detailed. We have set forth only a small part of it in order to show the disputes between Mann and Fender and their positions on the trial. Further discussion of it could serve no useful purpose. Under the evidence the jurors were justified in believing that Fender's refusal to honor the take-out agreement did not place the Mann defendants under economic duress, and that Fender acted in good faith. The jury were also entitled to believe that any financial stress suffered by Mann and the trusts stemmed not from Fender's actions but from Mann's indictment by the federal authorities (which, according to Mann, ended in his acquittal and the discharge of the federal prosecutor who brought the charge against him), and from the actions of the Federal Reserve Board after and partially based upon the fact of the indictment. Additionally, the credibility of Mann and Fender and Rusek and other witnesses was placed sharply in issue on the trial. As triers of the facts it was the prerogative and duty of the jurors to weigh all of the evidence, ferret out what they believed to be its most credible parts, and answer the issues accordingly. Under all of the proof, we believe the jury's answers either affirmatively or negatively to the issues in question would have been based upon factually sufficient evidence. Therefore, we cannot say their answers are against the great weight and preponderance of the evidence.

This suit was filed by Fender on May 10, 1974. Soon thereafter, on May 17, 1974, the parties entered into a written agreement, filed in the papers of the case, under which Mann and the other defendants sold Fender 9,484 shares of the Kilgore Bank Stock for the consideration of $140.00 per share which Fender paid. The agreement contained these pertinent provisions:

### 2.

"Defendants will transfer to [Fender] 9484 shares of stock in [Kilgore Bank], being all of the stock held by Defendants in said Bank with the exception of the 4635 shares to which Plaintiff asserts a claim of ownership and 100 shares being retained by Robert A. Mann.

### 5.

"The temporary restraining order heretofore issued in this Cause [enjoining Mann from selling any of the stock to anyone other than Fender] shall be continued until final determination of this cause, or until subsequent order of this Court.

### 6.

"Defendants acknowledge and agree that the remaining 4635 shares of stock in [Kilgore Bank] mentioned [in paragraph 2] represent one-half of the 9270 shares of stock in said Bank acquired by Robert A. Mann from [Houston Southwest] on or about November 15, 1972.

### 7.

"This agreement and the transfer of the 9484 shares of stock in [Kilgore Bank] from Defendants to Plaintiff, as herein provided, shall be without prejudice to the rights of any party to this suit and without prejudice to the rights, if any, of any of said parties to the 4635 shares."

Mann contends that under the terms of this agreement, the court erred in awarding Fender the "100 shares being retained by Robert A. Mann" referred to in the agreement. The ownership of those shares is very important to the parties. If they are owned by Mann, then under the Control Agreement he will continue as Chairman of the Board and Chief Executive Officer of the Kilgore Bank and will also determine the vote of all the control stock on all disputes concerning the election of directors and the policies and management of the Bank.

Mann points to the fact that the agreement was executed after his offer of sale of all of his stock to Fender on April 30, 1974, and Fender's acceptance of the offer on May 9, 1974; and asserts that the agreement superseded the April 30th sale as to the 100 shares, vested their ownership in him, and "removed the 100 shares from consideration in this suit." In support of that contention as the intention of the parties, Mann argues that after the trial agreement was executed there were no pleadings and no claims by Fender for the 100 shares. We cannot agree with that argument. Fender alleged his claim of ownership of the 4,635 shares and pleaded the April 30, 1974, offer and acceptance and reasserted his right thereunder "to purchase the 9,584 shares of such stock to which he does not assert any claim of ownership" in his First Amended Original Petition filed June 10, 1974, and in his Second Amended Original Petition (his trial pleading) filed August 27, 1976; and in each he expressly prayed for judgment "1. Declaring Plaintiff to be the owner of 4,635 shares of the stock" and "2. Declaring that Plaintiff has the right to purchase the remaining 100 shares of the stock still held by Defendants." Additionally, after verdict, Fender moved for judgment (on the verdict and under the April 30, 1974, contract) requiring defendants to deliver to him the remaining 4,635 shares and "100 shares" still held by Mann. On the other hand, although Mann and the trusts disputed Fender's claim to the 4,635 shares and sought to avoid the offer-acceptance of April 30, 1974, on the ground of duress in their first and second amended answers and cross actions which were both filed after the execution of the agreement in question, neither Mann nor the trusts asserted in those pleadings that regardless of the merit of their duress defense they owned the 100 shares under the trial agreement. The only specific mention of the 100 shares was in the prayer of defendants' second amended answer and cross action (their trial pleading) in which they prayed "and further that it be found that Defendants have no obligation to sell to Fender the 4,635 shares of stock in the Kilgore Nation-

al Bank as alleged by Fender, nor the 100 shares, or, alternatively, in the event that it be found that Fender does have a right to purchase any of said stock, that Fender be required to pay $140.00 per share." This prayer does not set up an independent claim of ownership under the trial stipulation of the 100 shares.

 Mann says that resolution of any fact question under the agreement as to the intention of the parties relating to the 100 shares was waived by Fender when Fender failed to request an issue to the jury on the question. There is no merit to that argument. The intention of the parties in a trial stipulation is for the determination of the court from the language used in the entire agreement "in the light of the surrounding circumstances, including the state of the pleadings, the allegations therein, and the attitude of the parties in respect of the issues." *Texas Indemnity Ins. Co. v. Dunn*, 221 S.W.2d 922, 924 (Tex.Civ.App.—Waco 1949, no writ). If the stipulation is ambiguous and uncertain in its terms, it should be disregarded by the court. *Sergeant v. Goldsmith Dry Goods Co.*, 110 Tex. 482, 221 S.W. 259, 261 (1920).

 Plainly, the court construed the stipulation to be an expedient of the parties pending determination of their disputes over ownership of all the shares, and not an intended relinquishment by Fender of his claim to the 100 shares. We believe that construction correct. A trial agreement will not be construed so as to waive a right not plainly agreed in it to be relinquished. *Jackson v. Lewis*, 554 S.W.2d 21, 24 (Tex. Civ.App.—Amarillo 1977, no writ).

The remaining points of error are also without merit under the record, and they are overruled.

The judgment is affirmed.

JAMES, Justice, dissenting.

I respectfully dissent. I would affirm a portion of the trial court's judgment, reverse and render a part thereof, and reverse and remand a part thereof. More specifically, I would sustain Appellant's points numbers 8, 9, 14, and 15.

Appellant's point of error no. 8 complains that the trial court erred in rendering judgment awarding to Fender the 100 shares of Kilgore Bank stock "retained by Mann" pursuant to the May 17, 1974, stipulation by the parties. For convenience in discussion, where appropriate I will refer to Mr. Fender and his interests as "Fender," and to Mr. Mann and his interests as "Mann."

The so-called "stipulation" is denominated by the heading, "Agreement," is dated May 17, 1974, and is signed by counsel for Fender and Mann. This agreement is not ambiguous, insofar as the disposition of the 100 shares is concerned, in my opinion, and was executed subsequent to Mann's letter to Fender dated April 30, 1974 (Pl.Ex.No. 11) and Fender's reply to Mann dated May 9, 1974 (Pl.Ex.No. 12).

The three paragraphs pertaining to the 100 shares are numbers 2, 6, and 7, and read as follows:

"2.

"Defendants will transfer to Harris R. Fender, Individually and as Trustee for Harris R. Fender, Jr. and David M. Fender, 9484 shares of stock in Kilgore First National Bank of Kilgore, being all of the stock held by Defendants (Mann) in said Bank with the exception of the 4635 shares to which Plaintiff (Fender) asserts a claim of ownership and 100 shares being retained by Robert A. Mann.

\* \* \* \* \* \*

"6.

"Defendants acknowledge and agree that the remaining 4635 shares of stock in Kilgore First National Bank of Kilgore mentioned in the preceding paragraph represent one-half of the 9270 shares of stock in said Bank acquired by Robert A. Mann from Southwest Bancshares, Inc. on or about November 15, 1972.

"7.

"This agreement and the transfer of the 9484 shares of stock in Kilgore First National Bank of Kilgore from Defendants to Plaintiff, as herein provided, shall be with-

out prejudice to the rights of any party to this suit and without prejudice to the rights, if any, of any of said parties to the 4635 shares."

At the time the May 17, 1974, Agreement was executed, 14,219 shares of Kilgore Bank stock were in issue, with different questions involved with respect to different portions. The stipulation provided that Mann would transfer to Fender 9484 shares, being all the stock held by Mann in said Bank except (1) the 4635 shares which Fender was claiming and (2) 100 shares being retained by Mann.

It is significant that the final paragraph (7) provides that this transfer of the 9484 shares and the 4635 shares would be without prejudice to any party, but does not say anything about Mann's retention of the 100 shares being without prejudice.

It is to be remembered that all of this stock was in Mann's name, and that Fender as Plaintiff had the burden of establishing his entitlement thereto before he would be allowed to divest Mann of same. By the clear and unambiguous provisions of this Agreement, the 100 shares retained by Mann were removed from consideration in this suit. Fender sued Mann to establish his right to the 14,219 shares of Kilgore Bank stock held by Mann and in Mann's name. Appellee Fender relies upon Mann's letter to him of April 30, 1974, as an offer to sell him these 14,219 shares, which he (Appellee Fender) asserts he accepted by his reply letter to Mann of May 9, 1974. The trial court's judgment recites that Mann's letter of April 30, 1974, constituted an offer by Mann to sell these 14,219 shares, which was accepted by Fender. These findings in the trial court's judgment are in direct conflict with the clear provisions of the May 17, 1974, agreement. Mann's letter of April 30, 1974, and Fender's reply letter of May 9, 1974, are preliminary negotiations leading up to the written Agreement of May 17, 1974, wherein it was expressly provided that Mann would retain these 100 shares. Appellee Fender neither offered any evidence nor requested any issues which would cause him to be entitled to these 100 shares,

nor has Appellee made any effort to modify, explain, or otherwise attack the Stipulation. To the contrary, Appellee has at all times stood upon and confirmed the Stipulation. Appellee Fender as Plaintiff had the burden to establish his right of ownership to these 100 shares of stock; however, he neither offered evidence to support such claim nor requested the submission of special issues supporting such claim. After jury verdict, the 100 shares of stock still stood in Mann's name and possession. The "without prejudice" part of the Stipulation by express wording only related to the 9484 shares and the 4635 shares, and by necessary implication did not refer to or include the 100 shares, and therefore cannot be relied upon by Appellee as a basis for avoiding the effect of Mann's retention of the same. Appellee Fender's failure to present evidence or secure jury findings entitling him to the 100 shares resulted in a waiver of his claim of ownership to such shares. An independent ground of recovery or defense not conclusively established by the evidence is waived if no issue is given or requested. Rule 279, Texas Rules of Civil Procedure; *Glens Falls Insurance Co. v. Peters,* (Tex.1965) 386 S.W.2d 529 and the cases cited therein on page 531.

For the foregoing reasons, I would hold that that portion of the trial court's judgment wherein Mann was divested of the 100 shares in question and that Fender was awarded such shares for a payment of $14,000 plus interest from May 10, 1974, to the date of judgment in the amount of $3282.37 be reversed and rendered, and that said judgment adjudge Mann to be the owner of such 100 shares with a corresponding reduction in the money Mann is to receive by the amount of $14,000.00 plus $3282.37 interest to the date of judgment.

Appellants' point of error 9 contends the trial court erred in rendering judgment to the effect that the Mann defendants take nothing by their counterclaim against Fender for breach of contract, because the jury's failure to find that the $600,000.00 note was not in default is so against the great weight and preponderance of the evidence as to be

manifestly wrong and unjust; and because of the jury findings that Fender had notice of a claim of usury (Special Issue No. 3), and that upon such notice, a reasonable man would not have taken out the $600,-000.00 note (Special Issue No. 4) are immaterial and constitute no defense as a matter of law. I would sustain these contentions.

By points of error numbers 14 and 15, Appellants assert that the jury's answers to Special Issues Numbers 3 and 4 (relative to usury) had such a prejudicial effect that it permeated the entire charge to Mann's prejudice, thereby increasing Mann's burden on all the issues as well as constituting an incurable comment on the weight of the evidence. I would sustain these contentions and would hold that the jury's answers to Special Issues Numbers 3 and 4 concerning usury did permeate the entire charge to Mann's prejudice and thereby increased Mann's burden of proof, particularly insofar as Mann's cross-action against Fender for damages for breach of contract and his cause of action based upon duress are concerned.

Special Issue No. 5 submitted to the jury read as follows:

"Do you find from a preponderance of the evidence that immediately prior to March 24, 1974, the $600,000.00 note executed by First Madison Corp. was not in default?

"Answer: 'It was not in default' or 'It was in default.' "

To which the jury's answer was: "It was in default."

I believe this jury's failure to find that this note was not in default is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust, under the doctrine of *In re King's Estate* (Tex.1951) 150 Tex. 662, 244 S.W.2d 660, and should be set aside. To show my reasons for this conclusion I have weighed all the evidence on both sides of this issue, as mandated by our Supreme Court, and will now review such evidence:

On March 23, 1972, Fender executed a written "Take-Out" agreement by which he agreed to purchase a $600,000.00 promissory note made by the First Madison Corporation and payable to Great Southwest Mortgage and Investment Co., Inc. This $600,-000.00 note was endorsed to Mann's children's trusts, with Mann at that time Trustee. The note was secured by a 425 acre tract of land located in Rains County, Texas. Under said agreement, Fender agreed to purchase the take-out note if called upon to do so between February 24, 1974, and March 24, 1974. For this agreement Fender received $30,000.00 cash plus the right to purchase one-half of the Rains County land for $1,000.00, which land was at that time appraised at $956,800.00. The take-out agreement enabled First Madison Corporation (maker of the take-out note) to obtain funds to purchase the Rains County land. The Mann Defendants agreed to loan First Madison Corp. the $600,000.00 purchase price if First Madison would repay or refinance the amount within two years. Therefore, the effect of the take-out commitment was that the Mann Defendants would fund the purchase of the Rains County land from March 1972 through March 1974, and thereafter, Fender, by the performance of the take-out agreement, would fund the purchase.

The Mann Defendants advanced $600,-000.00 and became holders of the take-out note. To fund the note the Mann Defendants obtained a $600,000.00 loan from Continental National Bank in Fort Worth, which loan was personally guaranteed by Mann. Moreover, the take-out note was assigned to the Continental Bank as collateral for the Mann Defendants' loan.

The take-out agreement provided that Fender would be given 30 days notice by Mann or his nominee prior to Fender's obligation to purchase the take-out note, and required that said note not be in default at the time of purchase by Fender. On February 15, 1974, Continental Bank as nominee of Mann, gave written notice by letter to Fender providing that Continental Bank desired Fender to exercise his take-out obligation on or before March 24, 1974.

Fender responded by letter inquiring whether all conditions precedent were satisfied. Continental Bank, by letter of Frank C. McDowell, an officer of said Bank, by letter of March 18, 1974, notified Fender that all closing requirements had been met; and concerning whether the note was current or not, the letter read as follows:

"4. To the best of my knowledge, the note which will be assigned to you is current in all respects with no conditions of default."

Replying to this, Fender on March 26, 1974, sent a telegram to McDowell at Continental Bank with a copy to Mann, saying in its pertinent parts: "\_\_\_\_\_. Please advise whether March 24, 1974, installment has been paid and whether all interest quarterly installments have been paid to a current date. We also wish to know what you propose to do with regard to the claim by maker of note that interest is usurious. If all conditions of our commitment have been met, we will be in a position to close this matter."

In response to Fender's telegram, Mann on the next day sent a telegram to Fender stating: "Re your telegram March 26, all interest paid to current date STOP I warrant no usury STOP all conditions met STOP please proceed." In spite of the foregoing, Fender, although recognizing that all other conditions had been met, claimed that he was not satisfied that the note was not in default, and therefore refused to honor his take-out agreement.

Mann filed a counterclaim against Fender for breach of contract because of Fender's refusal to perform on the take-out agreement. Fender defended, contending: (1) that he did not receive evidence prior to March 24, 1974, that the take-out note was current; (2) that the interest on the note was not in fact current as of March 24, 1974; and (3) that he (Fender) was put on notice that the maker of the take-out note was claiming that the note was usurious. Upon these asserted grounds, Fender claimed he was released from his obligation to perform the take-out agreement. Mann pleaded and offered evidence to the effect

that because of Fender's refusal to perform the take-out agreement that he was placed under great financial pressure from several sources which was tantamount to duress caused by Fender for which he sought actual and exemplary damages.

It is my opinion that the great weight and preponderance of the evidence overwhelmingly established that the take-out note was not in default immediately prior to March 24, 1974. The issue narrows itself actually down to whether the interest was current on the take-out note at said time.

Walter J. Rusek, a certified public accountant, was at the times pertinent to this issue the Trustee of the trusts for Mann's three children, and primarily responsible for Mann's financial and accounting matters. Rusek testified that Mann and the makers of the take-out note entered into an arrangement whereby the interest due under the take-out note was to be offset against certain interest payments owed by Mann. The interest offset involved the Mann trusts (who were the owners of the take-out note), Mann individually, First Madison Corporation (the maker of the take-out note), and a group of investors, including Mann and shareholders of First Madison. Rusek testified that the interest due on the take-out note was offset against interest due another entity (to wit, Premier Properties) by Mann. Rusek was the man primarily responsible for the keeping and handling of the financial records of Mann and the Mann Trusts, and testified how those books and records were kept. Rusek testified that the interest offsets were actually made and therefore that the take-out note was current.

Robert A. Mann testified concerning the agreement to offset interest which was being implemented at the time critical to the take-out agreement, to wit, March 24, 1974, which agreement involved Mann, L. L. Wood, Fred N. Neely and others interested in First Madison Corporation. Mann further testified that all the conditions precedent to Fender's take-out agreement had been satisfied, and that he had informed the Continental National Bank that the

note was current in all respects with no conditions in default. Moreover, when Fender telegraphed Continental Bank on March 26, 1974, with copy to Mann, inquiring as to whether the note was current, Mann on the next day sent a telegram to Fender stating, "Re your telegram March 26, all interest paid to current date STOP I warrant no usury STOP all conditions met STOP please proceed."

L. L. Wood, an attorney, was the personal guarantor of the take-out note and was a shareholder in the First Madison Corporation, the maker of the take-out note. Wood testified concerning the arrangements with respect to the interest offsets, explaining that certain interest payments owed by Mann were paid on Mann's behalf by a group of investors with whom Mann was associated and that such interest payments were offset against interest due on the take-out note. Wood testified that he personally made the offsetting interest payments on behalf of Mann and considered such payments to be offset against interest due by First Madison Corporation on the take-out note.

Fred N. Neely, a former owner of First Madison Corporation, corroborated the offset arrangement, testifying:

"The deal was set up, Mr. Mann was a participant in a joint venture that we referred to as the Premier Properties, 131, or joint venture; and we all offset the interest, or it was set up initially for the interest to be offset. We owed him so much interest, on the $600,000.00 and he owed interest payments on our deal."

Frank C. McDowell was a vice-president of Continental National Bank and the officer responsible at Continental National Bank for the $600,000.00 loan to Mann's children's trusts, and was generally familiar with the take-out note. On February 15, 1974, McDowell wrote a letter to Fender that Continental Bank as Mann's nominee, was requesting Fender to exercise his take-out obligation. Fender replied by his letter to McDowell dated March 14, 1974, inquiring whether the note was in default. McDowell answered Fender's letter by his

(McDowell's) letter of March 18, 1974, and after stating that all the other requirements had been met, stated, "To the best of my knowledge, the note which will be assigned to you is current in all respects with no conditions of default." McDowell testified to several conversations he had with Charlie Woolridge, who was Fender's employee designated by Fender to determine for Fender whether the take-out note was current. McDowell in this regard testified as follows:

"I told Mr. Woolridge that we were looking primarily to Mr. Mann, personally, for the repayment of our loan and that the note that was assigned to us, we were not receiving the interest payments that were due under that note directly but that I had conferred with Mr. Mann and he had told me that the note was current and the note that we had with the Mann Trusts was also current. I told Mr. Woolridge that."

"Q. If they came forward with the take-out you were in a position to transfer the note as being current, were you not, sir?"

"A. Yes, sir."

The evidence clearly showed that the specific arrangements agreed upon were carried out; that is to say, that the interest due under the take-out note was satisfied by offsets against interest owed by Mann in regard to other unrelated transactions.

Fender's testimony was to the effect that the only condition precedent to his performance of the take-out agreement was whether the interest due on the note was current. Fender gave no testimony to the effect that the note was in default, and apparently had no personal knowledge as to whether the note was in default or not.

Likewise, Charles R. Woolridge, Fender's employee who was requested by Fender to determine whether all conditions were fulfilled, testified that the only condition in dispute was whether the note was in default. Woolridge likewise was unable to testify to any facts to the effect that the note was in default.

The only evidence that the take-out note might be in default was circumstantial evi-

dence growing out of the lack of written records reflecting the interest offsets after 1972. In other words, the interest was posted on the note through the year 1972, but was not posted thereafter. Rusek explained that this gap was due to negotiations with the Internal Revenue Service relating to the amendment of Mann's income tax returns and Rusek's election not to record the offsets as income to Mann until the problems with Internal Revenue Service were resolved. In my opinion, this absence of interest postings is factually insufficient to support the jury's failure to find that the take-out note was not in default.

Continental National Bank was the holder of the take-out note, since said note had been assigned by the Trustee of the Mann's children's trusts to said Bank as collateral. However, Continental Bank had designated Mann to receive the interest on the take-out note, and had in effect made Mann its agent for purposes of determining whether the note was or was not current. Thus, Mann and his agent Rusek were more than mere "interested parties," whose testimony is to be discounted; to the contrary, they were in the actual position as the holder of the note insofar as having the power to determine discharge and satisfaction of the interest obligation of the take-out note. Moreover, the interest offset arrangement testified to by Mann, the maker of the take-out note corroborated by others having knowledge of same, does not conflict or violate the Texas Business & Commerce Code. Section 3.603(b) provides:

"Payment or satisfaction may be made with the consent of the holder by any person including a stranger to the instrument."

Section 3.601(b) provides:

"Any party is also discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money."

Under these provisions the maker's obligation to pay interest on the take-out note can be and was here satisfied and discharged by the agreement between the maker and Mann.

We now move to a discussion of the trial court's submission to the jury of Special Issues Numbers 3 and 4 and the jury's answers thereto:

"Special Issue No. 3: Do you find from a preponderance of the evidence that prior to March 24, 1974, Harris R. Fender was put on notice of a claim of usury by the maker of the $600,000.00 First Madison Corp. note?" To which the jury answered, "He was."

Then conditioned upon an affirmative answer to Special Issue No. 3, the court submitted this issue:

"Special Issue No. 4: Do you find from a preponderance of the evidence that upon receiving such notice of usury, if you have so found, a person of ordinary prudence in the exercise of ordinary care would not have taken out such $600,000.00 note?" To this issue the jury answered: "He would not have."

Neither Special Issues Nos. 3 or 4 are controlling issues and in my opinion it was error for them to be submitted to the jury. Fender testified that he was told prior to March 24, 1974, that the maker of the take-out note or its guarantors might claim that the note was usurious, and this was one of his asserted reasons for refusing to perform his take-out agreement. However, Fender neither alleged nor proved that the note was usurious, and there is no showing that after Fender heard of such possible claim of usury, that he made any investigation to determine whether the note was in fact usurious. There is no evidence in the record whatever that the note was in fact usurious.

Fender was contractually obligated to purchase the take-out note. His hearing about the possibility of a usury claim which might be made does not constitute a defense to his failure to honor his take-out agreement. The only provision in the take-out agreement touching on usury or the possibility thereof is paragraph 9 which reads as follows:

"9. In no event shall I be entitled to receive, nor shall the maker of said note be obligated to pay any amount as interest in excess of the highest rate permitted by the laws of the State of Texas. If I should ever receive an amount which would exceed the highest lawful rate, the amount which would be excessive interest shall be applied to the reduction of the principal of the loan and not to the payment of interest. The provisions of this paragraph shall control over the provisions of every other agreement between us." By the foregoing language, the take-out agreement specifically provided for the possibility that the take-out note might be usurious.

The jury's answer to Special Issue No. 4, wherein the jury found that a reasonable man would not perform a contractual obligation, is no defense to Fender's breach of contract. The man who reasonably breaches his contract is nevertheless liable for damages resulting therefrom. In other words, reasonable care is no justification for breaching a contract. See *City of Dallas v. Shortall* (Tex.1938) 131 Tex. 368, 114 S.W.2d 536; *State v. F. & C. Engineering Co.* (Houston 14th CA 1969) 438 S.W.2d 647, NRE (where contractor's failure to perform was not excused by the fact that performance would be more expensive than contractor expected); *Radio News Assn. v. Eagle Broadcasting Co.* (San Antonio Tex.Civ.App.1940) 144 S.W.2d 915, writ dismissed (where performance of a contract was not excused because it would work a hardship); *McCoy v. Dolph Construction Co.* (Waco Tex.Civ.App.1947) 203 S.W.2d 661, no writ. Thus, the jury findings that Fender received notice of usury and that a reasonable person would not have exercised the take-out agreement are immaterial and provide no basis for a defense to Fender's breach of contract. More than that, the submission of these two special issues concerning usury created a prejudicial atmosphere against Mann and permeated the entire charge insofar as all of Mann's claims for damages are concerned. Usury has been condemned in the Bible as well as in man-made law. During jury deliberations, the jury sent a note to the court asking for a definition of the term "usury." The trial court refused to furnish a definition of same; therefore the jury was required to speculate about what usury meant and whether notice of usury was a defense to Mann's claim of duress. I believe these issues increased Mann's burden concerning his duress defense and counterclaims. Once the jury concluded that a reasonable man, after receiving notice of a claim of usury, would refuse to honor his contractual obligation, then Mann's burden to show that Fender's failure to honor the take-out agreement amounted to duress was greatly increased, in my opinion.

For the foregoing reasons, I would:

(1) Reverse and render that portion of the trial court's judgment wherein Mann was ordered to sell and transfer 100 shares of the Kilgore Bank stock for $14,000.00 plus $3282.37 interest to date of said judgment. In this connection I would hold that Mann is adjudged to be the owner of such stock, and that the total amount of money Mann is to receive in said judgment be reduced by the stated value of said stock plus interest, to wit, $17,282.37;

(2) I would reverse and remand for retrial on the merits all of the matters set out in Mann's crossaction based upon Fender's alleged breach of contract and duress; in other words, all those matters embraced in Special Issues Numbers 3 through 14, inclusive;

(3) I would assess the costs in the trial court and on appeal equally against Mann and Fender; and

(4) In all other respects I would affirm the trial court's judgment.